## McGOURKEY *v.* TOLEDO AND OHIO CENTRAL RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 35. Argued November 4, 1892. — Decided December 19, 1892.

On the 2d of April, 1884, M. filed a petition to intervene in a suit which had been commenced January 2, 1884, for the purpose of foreclosing a mortgage on a railroad. A receiver had been appointed and was in possession of the road and rolling stock. The intervenor claimed title to a large part of the latter. The petition prayed (1) that the receiver perform all the covenants of the lease, and pay all sums due, etc.; (2) or that he be directed to deliver to petitioner the rolling stock in order that the same might be sold; (3) that he be directed to file a statement of the number of miles run, and of the sums received for the use of such rolling stock; (4) that it be referred to an examiner to take testimony and report the value of the use of such rolling stock while in the custody of the receiver, and that the receiver be directed to pay the amount justly

·due, etc. On the 10th of December, 1884, a decree of foreclosure and sale of the railroad and after acquired property was entered. On the 9th of June, 1885, a decree was rendered upon the intervening petition ordering the receiver to deliver up to the petitioner certain cars and locomotives to be sold. On the 14th of August, 1886, answers were filed, under leave, to the intervening petition, setting up title in the respondents to the rolling stock. The court found against the intervenor as to most of the stock, and his petition was dismissed. *Held*, that the decree of June 9, 1885, was not a final judgment.

If a court make a decree fixing the rights and liabilities of the parties and thereupon refer the case to a master for a ministerial purpose only, and no further proceedings in court are contemplated, the decree is final; but if it refer the case to him as a subordinate court, and for a judicial purpose, the decree is not final.

The cases respecting final and interlocutory judgments, and the distinction between them, reviewed.

Any arrangement by which directors of a corporation become interested adversely to the corporation in contracts with it, or organize or take stock in companies or associations for the purpose of entering into contracts with the corporation, or become parties to any undertaking to secure to themselves a share in the profits of any transactions to which the corporation is a party, are looked upon with suspicion.

On all the facts in this case, as detailed in the opinion of the court, *infra*, *Held*:

(1) That the contracts with the trustee for the holders of the car-trust certificates was voidable at the election of the corporation;

(2) That it was in law a purchase by the railway of the rolling stock in question;

(3) That the device of the certificates was inoperative to vest the legal title in the petitioner, or to prevent the lien of the railway mortgage from attaching to it, or to prevent the delivery of the rolling stock to the road;

(4) That being the property of the road the petitioner was not entitled to rent;

(5) That the leases might be treated as mortgages, and that the petitioner's interest thereunder was subordinate to that of the mortgage bondholders;

(6) That the transaction, though not an actual fraud, was a constructive fraud upon the mortgagees.

THESE were two intervening petitions, filed by McGourkey as trustee for the holders of certain car-trust certificates, to compel the performance, by the receiver of the defendant railway company, of the covenants of certain leases made by the petitioner with said company, or the delivery by the receiver

to the petitioner of a large amount of rolling stock described in these leases, in order that the same might be sold, and for an account and payment of the rental value of such rolling stock, while in the custody of such receiver.

On January 7, 1884, the Central Trust Company of New York filed its bill in equity in the Circuit Court of the United States for the Northern District of Ohio, for the foreclosure of a certain mortgage for $3,000,000, for non-payment of interest, the mortgage covering not only the line of the railroad between the terminal points, but the rolling stock, "together with all the engines, cars, machinery, supplies, tools and fixtures, now or at any time hereafter held, owned or acquired by the said party of the first part for use in connection with its line of railroad aforesaid." There was also a covenant for further assurance applicable to "all such future acquired depots, grounds, estates, equipments and property as it may hereafter from time to time purchase for use in and upon said line of railroad, and intended to be hereby conveyed." Upon the filing of the bill, the railroad company entered its appearance, waived a subpœna, and consented to the appointment of a receiver; and upon the same day, John E. Martin was appointed receiver with the usual powers in such cases.

On April 2, 1884, the petitioner, George J. McGourkey, intervened by leave of the court and filed two petitions based upon three car-trust leases known as Lease A, Lease B No. 1, and Lease B No. 2. The first petition represented that the agreement known as Lease A was entered into on August 20, 1880, whereby the railroad company agreed to hire from petitioner, as trustee, 800 coal cars and 14 locomotives for a period of ten years from the date of their delivery to the company, the company agreeing to pay as rent $100,000 on their delivery, and in addition thereto $40,000 per year, with interest at the rate of 8 per cent; that in case of default in payment of rent, petitioner might, at his option, remove such locomotives and cars, sell them at public or private sale, apply the proceeds to the payment of any instalment of rent and interest not theretofore paid, for the whole term, whether such

instalment was due or not, the surplus to be paid to the company; but if the proceeds should not be sufficient to pay the expense of removal and sale, together with the rent and interest, the company was to pay the petitioner the difference. That under this agreement he delivered 14 locomotives marked "Ohio Central Car Trust," numbered 17 to 30 inclusive; also 800 coal cars, bearing the same marks; that the company defaulted in the payment of interest; and that petitioner demanded possession of the cars and locomotives, and was placed in possession of the same, but they afterwards passed into the possession of the receiver, who refused to deliver them up without the authority of the court. There were other covenants in the lease, a copy of which was annexed to the petition as an exhibit, not necessary now to be mentioned.

The second intervening petition was based upon car-trust Leases B No. 1 and B No. 2, copies of which were attached to the petition as exhibits. Lease B No. 1 bore date March 1, 1881, and embraced 1400 coal cars. Lease B No. 2 bore date March 1, 1882, and embraced 2500 coal cars, including the 1400 covered by Lease B No. 1; also 340 box cars and 13 locomotives. The two leases attached to this petition were not substantially different from Lease A in their general provisions. Both provided for the leasing of equipment not then in existence, bearing the numbers set out in the schedule thereto attached, to be delivered "as per the contract of the said McGourkey with the said makers." Leases A and B No. 1 provided that the railroad company might, for convenience, make the contract for the rolling stock directly with the makers. Lease B No. 2 also provided that the railroad company might, for convenience, "make the contracts for delivery direct with the makers of said locomotives and cars, but so as in no way to affect the title of said party of the first part to said equipment." All the leases provided that at all times the name, number and plate, or other signs of ownership of the said trustee, viz., "'Ohio Central Car Trust,' or the initials, to wit, 'O. C. C. T.,' shall be affixed and retained upon each of the cars aforesaid for the purpose of making the ownership known, and in the event of any such marks or sign being

destroyed; the Ohio Central Railroad Company will immediately restore the same, and that such other things shall be done as by the counsel of said trustee shall be deemed necessary and expedient for the full and complete protection of the rights of said trustee as the owner of said cars for the benefit of the holders of said obligations." Neither of these leases was ever recorded.

On December 10, 1884, a decree of foreclosure and sale was entered, describing the property mortgaged as composed of the railroad between the specific termini, together with the after-acquired property, in the language in which the same was described in the mortgage. The property was bid in by a committee of the bondholders, who, with some of the stockholders, proceeded to reorganize the road under the name of the Toledo & Ohio Central Railway Company, the real defendant in this proceeding.

On June 9, 1885, a decree was rendered upon the intervening petitions of McGourkey, purporting to be after due proof of service of notice upon the Central Trust Company, the Ohio Central Railroad, and the receiver. By this decree the receiver was ordered to deliver up to McGourkey the cars and locomotives described in said Lease A and said Leases B, at convenient points to be designated by petitioner, being in all 27 locomotives, 340 box cars and 3300 coal cars. The equipment was redelivered to McGourkey in pursuance of this order, and was by him, after leases of portions to the Baltimore and Ohio Railroad and the Toledo & Ohio Central Railway Companies, respectively, all sold at public auction for the benefit of his fiduciaries in December, 1885.

On August 14, 1886, the Toledo & Ohio Central Railway Company, and on the 1st of October, 1886, the Central Trust Company, answered under leave of the court the intervening petitions of McGourkey, averring that the locomotives and cars were sold and were paid for by the Ohio Central Railroad Company, and passed under and became subject to its mortgage; that they were sold under the decree of foreclosure, and duly conveyed to the purchasing trustees, and thereby the leases from McGourkey became inoperative and of no effect;

that the purchasing trustees afterwards transferred all their right, title and interest in the same to the Toledo & Ohio Central Railway Company; and that the same are now the property of such company. The answer closed with a prayer that both said leases and agreements be declared null and void; that McGourkey might be decreed to have no title or interest in said rolling stock; and that the railway company be put in possession thereof. The answer of the railway company was much more specific in its details, setting forth particularly how the same had been purchased and paid for.

On June 7, 1887, the special master filed his report, to which exceptions were filed by McGourkey to the amount allowed; and by the Toledo & Ohio Central Railway Company and the receiver to the special findings of facts, and also to the amount allowed.

The case subsequently came before the court upon exceptions to the report of the special master. The court found against the title of McGourkey to most of the property, and that, so far as he had established any right to, or lien upon, the rolling stock, it appeared that he had already been paid therefor by the company and the receiver more than he was entitled to, and his exceptions were, therefore, overruled and his petitions dismissed. 36 Fed. Rep. 520. McGourkey thereupon appealed to this court. The material facts are fully stated in the opinion of the court, [see *infra,* pages 553 to 563].

*Mr. George Hoadly* and *Mr. Fisher A. Baker* for appellant, upon the question of estoppel.

Appellees are estopped to dispute appellant's title.

The decree of June 9, 1885, was made upon the intervening petitions of McGourkey, filed more than fourteen months previously, and on " due proof of service of notice of application for an order granting the prayer of said petition on the Central Trust Company of New York, the Ohio Central Railroad and on J. E. Martin, Esq., Receiver," and after hearing counsel for the receiver and the Central Trust Company. At that time the Toledo & Ohio Central Railroad Company was not a party to the cause, or interested in the property.

This decree was final, between the parties, as to the title and right of possession of the engines and cars. It left no open question; it granted the prayer of the intervening petitions. It was submitted on argument, counsel for the receiver and the Central Trust Company having been heard in opposition to the decree, and it finally disposed of all that part of the case which involved the title to the equipment and the right to receive rental for its use by the receiver, leaving for future consideration only the question how much additional rental would justly be payable. It is within the principles laid down in the case of the *Central Trust Company* v. *Grant Locomotive Works*, 135 U. S. 207. It has never been appealed from, and required and bound the learned Judge of the Circuit Court, on the principles established in that case, to proceed to hear and determine, upon the report of the master, what a fair compensation for the rental would be, and did not justify him in disregarding the report of the master, and determining that appellant under no circumstances was entitled to any compensation, or in reopening the question of title, as he attempted to do by the leave given to the Central Trust and the Toledo & Ohio Central Railway Companies to file such additional pleadings, "as in their judgment may be necessary to enable them to recover the rolling stock, cars and engines in the pleadings mentioned, or the value thereof."

It is proper, however, to say that the case of the *Central Trust Company* v. *The Grant Locomotive Works*, was decided by this court April 21, 1890; that at the time of Judge Jackson's decree in this case, Judge Baxter's order, which was reversed in that case, was in force, and was supposed to establish the law within the Sixth Circuit, so that the question of the conclusiveness and binding effect of the decree of June 9, 1885, could not, and did not, receive the consideration at the hands of counsel, or of his Honor, Judge Jackson, that it would have done at a later date.

The decree directing the delivery of possession to McGourkey could be changed or modified only upon petition for rehearing filed during the same term of the court, or upon appeal to this court, or by bill of review. In *Forgay* v. *Con-*

*rad*, 6 How. 201, 204, it was held that: "When the decree decides the right to the possession of the property in contest, and directs it to be delivered up by the defendant to the complainant, . . . and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, . . . although so much of the bill is retained in the Circuit Court as is necessary for the purpose of adjusting by a further decree the accounts between the parties pursuant to the decree passed."

In *Thomson* v. *Dean*, 7 Wall. 342, the court reaffirmed the rule laid down in *Forgay* v. *Conrad.* An order to deliver up stock was held final in this case, although an account was decreed to be taken as to the amount paid and to be paid for the stock, and as to dividends.

In *St. Louis, Iron Mountain & Southern Railroad* v. *Southern Express Co.*, 108 U. S. 24, two questions were presented: first, whether the railroad was obliged to do certain transportation in question, and secondly, what was a reasonable compensation *pendente lite.* The decree required the railroad company to do the express company's business at reasonable rates. This was held to be final, to which was added, "Matters relating to the administration of the cause, and accounts to be settled in accordance with the principles fixed by the decree are incidents of the main litigation which may be settled by supplemental order after final decree." See also *Bostwick* v. *Brinkerhoff*, 106 U. S. 3; *Grant* v. *Phœnix Insurance Co.*, 106 U. S. 429.

In *Winthrop Iron Co.* v. *Meeker*, 109 U. S. 180, Chief Justice Waite (page 184) cites with approval the words of Mr. Justice McLean in *Craighead* v. *Wilson*, 18 How. 201, to the effect that:

"The decree is final 'on all matters within the pleadings,' and nothing remains to be done but to adjust the accounts between the parties growing out of the operations of the defendants during the pendency of the suit." See also *Hill* v. *Chicago & Evanston Railroad*, 140 U. S. 52; *Louisburgh Bank* v. *Sheffey*, 140 U. S. 445.

We respectfully submit that it would be the height of bad faith now to allow the Toledo & Ohio Central Railroad Company — the prayer of McGourkey's petition having been granted, the equipment having been placed in his possession for sale, in accordance with the terms of his lease, no appeal having been taken from the decree, part of the equipment having been leased to it, and the whole sold at auction in December, 1885, and dispersed, — to claim that all the while, and notwithstanding the decree, the equipment remained the property of the Ohio Central Railroad Company, or subject to the prior lien of the Central Trust Company, whose counsel were heard in opposition to the decree, and passed to the Toledo & Ohio Central Company, by a sale confirmed, and in pursuance of a deed executed after the date of this decree, and while McGourkey was in possession of the engines and cars and engaged in the execution of the decree.

*Mr. Stevenson Burke,* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The controversy in this case turns principally upon the title of the petitioner McGourkey to the rolling stock in question, and upon the relative priorities of the holders of the car-trust certificates, whom he represents, and the purchasers of the railway, who succeeded to the rights of the first mortgagees under the after-acquired property clause of the mortgage.

(1) We are confronted upon the threshold of the case with the proposition that the decree of June 9, 1885, ordering this property to be turned over by the receiver to the petitioner, was a final decree, which it was not in the power of the court at a subsequent term to disturb, and hence that the court was estopped to render the decree of February 4, 1889, from which this appeal was taken, at least in so far as it assumed to upset the title of McGourkey.

Probably no question of equity practice has been the sub-

ject of more frequent discussion in this court than the fnality of decrees. It has usually arisen upon appeals taken from decrees claimed to be interlocutory; but it has occasionally happened that the power of the court to set aside such a decree at a subsequent term has been the subject of dispute. The cases, it must be conceded, are not altogether harmonious. Upon the one hand it is clear that a decree is final, though the case be referred to a master to execute the decree by a sale of property or otherwise, as in the case of the foreclosure of a mortgage. *Ray* v. *Law*, 3 Cranch, 179; *Whiting* v. *Bank of the United States*, 13 Pet. 6; *Bronson* v. *Railroad Co.*, 2 Black, 524. If, however, the decree of foreclosure and sale leaves the amount due upon the debt to be determined, and the property to be sold ascertained and defined, it is not final. *Railroad Co.* v. *Swasey*, 23 Wall. 405; *Grant* v. *Phœnix Insurance Co.*, 106 U. S. 429. A like result follows if it merely determines the validity of the mortgage, and, without ordering a sale, directs the case to stand continued for further decree upon the coming in of the master's report. *Burlington, Cedar Rapids &c. Railway* v. *Simmons*, 123 U. S. 52; *Parsons* v. *Robinson*, 122 U. S. 112.

It is equally well settled that a decree in admiralty determining the question of liability for a collision or other tort, (*The Palmyra*, 10 Wheat. 502; *Chace* v. *Vasquez*, 11 Wheat. 429; *Mordecai* v. *Lindsey*, [*The Mary Eddy*,] 19 How. 199,) or in equity establishing the validity of a patent and referring the case to a master to compute and report the damages, is interlocutory merely. *Barnard* v. *Gibson*, 7 How. 650; *Humiston* v. *Stainthorp*, 2 Wall. 106.

It may be said in general that if the court make a decree fixing the rights and liabilities of the parties, and thereupon refer the case to a master for a ministerial purpose only, and no further proceedings in court are contemplated, the decree is final; but if it refer the case to him as a subordinate court and for a judicial purpose, as to state an account between the parties, upon which a further decree is to be entered, the decree is not final. *Craighead* v. *Wilson*, 18 How. 199; *Beebe* v. *Russell*, 19 How. 283.

But even if an account be ordered taken, if such accounting be not asked for in the bill, and be ordered simply in execution of the decree, and such decree be final as to all matters within the pleadings, it will still be regarded as final. *Craighead* v. *Wilson*, 18 How. 199; *Winthrop Iron Co.* v. *Meeker*, 109 U. S. 180.

In the case under consideration the petitioner prayed for four distinct reliefs:

1. That the receiver perform all the covenants of the lease, and pay all sums due, etc. ;

2. Or that he be directed to deliver to petitioner the rolling stock in order that the same might be sold ;

3. That he be directed to file a statement of the number of miles run, and of the sums received for the use of such rolling stock ;

4. That it be referred to an examiner to take testimony and report the value of the use of such rolling stock while in custody of the receiver, and that the receiver be directed to pay the amount justly due, etc.

The decree followed the general terms of the petition by ordering the rolling stock claimed to be delivered to McGourkey, and referring the case to a special master to determine the rental of the same while used by the receiver; the value of the rolling stock over and above the sums paid by the receiver to the petitioner while the same was in the custody of the receiver; the number of miles run by the receiver; the money received for the use of the same by other roads; the loss, damage, and destruction to the same while in the custody of the receiver; and also to " determine and report upon *all questions and matters of difference* between said receiver and said McGourkey, growing out of the use and restoration of said cars and locomotives." It is claimed that inasmuch as the court granted the prayer of the petitioner, and turned the property over to him, it was a final adjudication of his right to the same, notwithstanding the reference to a master for an accounting; and we are referred to certain cases in this court as sustaining this contention.

In *Forgay* v. *Conrad*, 6 How. 201, the object of the bill was

to set aside sundry deeds for lands and slaves, and for an' account of the rents and profits of the property so conveyed. The court entered a decree declaring the deeds fraudulent and void, directing the property to be delivered up to the complainant, directing one of the defendants to pay him $11,000, and "that the complainant do have execution for the several matters aforesaid." The decree then directed that the master take an account of the profits. Under the peculiar circumstances of the case the decree was held to be appealable, although, said Chief Justice Taney, "Undoubtedly it is not final in the strict technical sense of that term." The opinion was placed largely upon the ground that the decree not only decided the title to the property in dispute, but awarded execution.

In the very next case, *Perkins* v. *Fourniquet*, 6 How. 206, where the Circuit Court decreed that complainants were entitled to two-sevenths of certain property, and referred the matter to a master to take an account of it, the decree was held not to be final. And again in the next case, *Pulliam* v. *Christian*, 6 How. 209, a decree setting aside a deed by a bankrupt, directing the trustees under the deed to deliver up to the assignee all the property in their hands, and directing an account to be taken of the proceeds of sales previously made, was also held not to be a final decree. Indeed, the case of *Forgay* v. *Conrad* has been generally treated as an exceptional one, and, as was said in *Craighead* v. *Wilson*, 18 How. 199, 202, as made under the peculiar circumstances of that case, and to prevent a loss of the property, which would have been disposed of beyond the reach of an appellate court before a final decree adjusting the accounts could be entered. A somewhat similar criticism was made of this case in *Beebe* v. *Russell*, 19 How. 283, 287, wherein it was intimated that the fact that execution had been awarded was the only ground upon which the finality of the decree could be supported.

In *Thomson* v. *Dean*, 7 Wall. 342, the decree directed the defendant to transfer to the plaintiff certain shares of stock, and that an account be taken as to the amount paid and to be

paid for the same, and as to dividends accrued. But this was held to be a final decree upon the ground that it changed the property in the stock as absolutely and as completely as could be done by execution on a decree for sale. In this case the court did distinctly approve of *Forgay* v. *Conrad*, although the decree was put upon the ground that it decided finally the right to the property in contest.

In *Winthrop Iron Company* v. *Meeker*, 109 U. S. 180, a bill was filed to set aside as fraudulent the proceedings of a stockholders' meeting, and to have a receiver appointed. The decree adjudged that the proceedings of the meeting were fraudulent; that a certain lease executed in accordance with the authority then given was void; that a receiver should be appointed with power to continue the business; and that an account be taken of profits realized from the use of the leased property, and also of royalties upon certain ores mined by the defendants. The court held the decree to be final, because the whole purpose of the suit had been accomplished, and the accounting ordered was only in aid of the execution of the decree, and was not a part of the relief prayed for in the bill, which contemplated nothing more than a rescission of the authority to execute the lease, and a transfer of the management of the company to a receiver. The language of Mr. Justice McLean in *Craighead* v. *Wilson*, 18 How. 201, was quoted to the effect that the decree was final on " all matters within the pleadings," and nothing remained to be done but to adjust accounts between the parties growing out of the operations of the defendants during the pendency of the suit. The case was distinguished from suits by patentees in the fact that, in such suits, the money recovery is part of the subject-matter of the suit. In this particular, too, the case is clearly distinguishable from the one now under consideration, inasmuch as here the account which the special master was directed to take was within the issue made by the pleadings and a part of the relief prayed for in the petition, the absence of which was held by the court in the *Winthrop Iron Case* to establish the finality of the decree.

In *Central Trust Company* v. *Grant Locomotive Works*, 135

U. S. 207, certain decrees were set aside at a subsequent term of the court of its own motion. The decrees "determined the ownership of the locomotives and the right to their possession; that they were essential to the operation of the roads by the receiver, and should be purchased by him; that certain designated amounts should be paid for the rentals and the purchase price, which amounts were made a charge upon the earnings, . . . and that the amounts should be paid by the receiver." Apparently there was no reference at all to a master for an accounting, and the decrees were held to be final. Obviously the case is not decisive here.

Upon the other hand, in *Beebe* v. *Russell*, 19 How. 283, 285, the court decreed that the defendants should execute certain conveyances, and surrender possession, and then referred it to a master, to take an account of the rents and profits received by the defendants, with directions as to how the account should be taken. This decree was held not to be final, Mr. Justice Wayne remarking that it might be so "if all the consequential directions depending upon the result of the master's report are contained in the decree so that no further decree of the court will be necessary, upon the confirmation of the report, to give the parties the entire and full benefit of the previous decision of the court;" and that the decree is final when ministerial duties only are to be performed to ascertain the sum due. Practically the same ruling was made in the next case of *Farrelly* v. *Woodfolk*, 19 How. 288.

In the case of the *Keystone Manganese Co.* v. *Martin*, 132 U. S. 91, the bill was in the nature of an action of trespass for removing minerals from the plaintiff's land, and prayed for an injunction restraining the defendant from the commission of further trespasses, and for an account of the quantity and value of the ore taken. The court made a decree perpetually enjoining the defendant from entering upon or removing minerals from the land, and further ordering an account, etc. This was held to be not a final decree from which an appeal could be taken to this court, because it did not dispose of the entire controversy between the parties. This case is directly in point, and was referred to with approval in *Lodge* v. *Twell*, 135 U. S. 232.

There are none of these cases which go to the extent of holding a decree of this kind final. While it directed the surrender of the rolling stock in question to the petitioner, it did not purport to pass upon his *title* to the same, and referred the case to a master, in accordance with the prayer of the bill, to take an account not only of rents and profits and of damage to the rolling stock, but of "all questions and matters of difference" between the receiver and the petitioner "growing out of the use and restoration of the same." This decree could not be said to be a complete decision of the matters in controversy, or to leave ministerial duties only to be performed, or to direct an accounting merely as an incident to the relief prayed for in the bill.

But if the finality of this decree were only a question of doubt, we think that, in view of the manner in which it was treated by the court below, that doubt should be resolved in favor of the defendant. The decree was pronounced on June 9, 1885; on August 14, 1886, the Toledo & Ohio Central Railway Company, under leave of the court, and without objection, filed an answer, averring the ownership of the rolling stock to have been in the Ohio Central Railroad Company, and setting forth in detail the manner in which it had been purchased and paid for, and, without praying in terms that the former decree be set aside, asked that the leases be rescinded and declared to be null and void; that the money and evidences of indebtedness received by the petitioner be refunded; that the ownership of the cars be decreed to be in the defendant as purchaser under the foreclosure sale; and that it be put in possession thereof. A similar answer, adopting the allegations of the other, was filed by the Central Trust Company on October 1, 1886. If the former decree were final these answers were impertinent, and should have been stricken from the files. The special master to whom the case was referred stated in his report that the first contention related to the title to the property; that the order of reference to him treated it as the property of the trustee McGourkey; and that, in his opinion, the testimony failed to sustain the claims of the purchaser. Testimony upon the

question of title was taken by both parties to the proceeding. In the opinion of the court, too, which was filed September 3, 1888, it is stated to have been "conceded by counsel for petitioner McGourkey (and, as this court thinks, properly so) that complainant and the Toledo & Ohio Central Railway Company are not estopped by anything that has occurred during the progress of the foreclosure suit from setting up the claims they insist upon in respect to said equipment." In short, it was only in this court that the finality of this decree was claimed. The decree entered in pursuance of this opinion did not even assume to vacate the former decree, but treated the title to the property as distinct from the right of possession; found the issue joined in favor of the trust company and the railway company; overruled the exceptions of petitioner; set aside the report of the special master; disallowed McGourkey's claim; and dismissed his petitions. We lay no stress upon the fact that the Toledo & Ohio Central Railway Company was not made a party to the proceedings under the McGourkey petitions, since, having purchased the property while those proceedings were pending, at the foreclosure sale, it was affected with notice of the litigation.

(2) Counsel for the receiver and the Toledo & Ohio Central Railway Company, the real defendant in this proceeding, take the position that the so-called leases of McGourkey, under which he claims title to this rolling stock, and compensation for its use, were a mere device on the part of the syndicate, which organized and controlled the road, to keep the property covered by these leases from passing, under the subsequently acquired property clause of the mortgage, to the trust company, and to reserve it for their own use and emolument, or for the holders of the car-trust certificates. Contracts, by which railways, insufficiently equipped with rolling stock of their own, lease or purchase, under the form of a conditional sale, such equipment from manufacturers, are not of uncommon occurrence, and, when entered into *bona fide* for the benefit of the road, have been universally respected by the courts. *United States* v. *New Orleans Railroad,* 12 Wall. 362; *Fosdick* v. *Schall,* 99 U. S. 235; *Myer* v. *Car Company,* 102 U. S. 1.

Indeed, the business of manufacturing rolling stock and loaning it to railways which have not a sufficient capital to purchase a proper equipment of their own, has become a recognized industry. If, however, such contracts are made by directors of the road with themselves, or with others with whom they stand in confidential relations, they are open to the suspicion which ordinarily attaches to transactions between a corporation and its directors; and, if they appear to have been made directly or indirectly for their own benefit, courts will refuse to give them effect. *Drury* v. *Cross*, 7 Wall. 299; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Wardell* v. *Railroad Company*, 103 U. S. 651, 658.

It is earnestly insisted by the petitioner in this case that, if there were any fraud in this transaction, it was perpetrated not by him, but by the syndicate upon the railroad company, which they represented; and that, as the latter has made no complaint, neither the Trust Company, who took only the rights of the mortgagor, the Railroad Company, nor the Toledo & Ohio Railway Company, which succeeded only to the rights of the Trust Company, are in a position to take advantage of this fraud; and that the Toledo & Ohio Railway Company acquired no higher, better or other title than that of the parties to the suit in which the foreclosure sale was made.

There is no doubt that, if this railway company entered into a *bona fide* contract with McGourkey to lease of him rolling stock which legally or equitably belonged to him, his title would not be divested by the delivery of the property to the railroad company; the rolling stock would continue to be his property, and he would be entitled to the stipulated compensation for its use. It is also true that the future acquired property clause of a railway mortgage attaches only to such property as the company owns, or may thereafter acquire, subject to any liens under which it comes into the possession of the company. *United States* v. *New Orleans Railroad Company*, 12 Wall. 362. If, however, the property, though nominally leased by the railway company, was acquired under an arrangement which amounted in law to a purchase by it,

we know of no rule of law which will estop the mortgagee or a purchaser at a foreclosure sale from insisting that the railway thereby acquired the title to the property, and that it had become subject to the lien of the mortgage — in other words, the mortgagee is not bound by the construction put upon the contract by the mortgagor. Indeed, it is not the railway so much as the mortgagee, whose rights are impaired by a transaction of this kind; and, if the latter cannot take advantage of its illegality, it is probable that no one else would, since the railway is represented by directors who are charged with being parties to the scheme. It would be a strange anomaly if the very parties against whom the alleged device was directed were estopped to take advantage of it by the acts of a corporation represented and controlled by directors who were themselves parties to it. The gist of the complaint in this case is that it is *their* property which the petitioner is seeking to recover; that the title to it became vested in the railway company by its purchase, and that they have legally succeeded to the rights of the company.

The history of this case properly begins with a contract made on December 3, 1879, between a syndicate, known as the $3,000,000 pool, through its committee, composed of three prominent capitalists, and the firm of Brown, Howard & Co.; who were also members of the syndicate, wherein the firm agreed to purchase two lines of railway, and to organize a new company under the name of the Ohio Central Railway Company, with a capital stock of $4,000,000, which was to be delivered to the syndicate, to proceed and complete the road, and to purchase at the lowest cost $560,000 worth of equipment and place it on the line, free from liens or charges. They further agreed to procure the issue of $3,000,000 of first mortgage bonds, and also $3,000,000 of income bonds, secured by a mortgage upon the same property, inferior only to the first mortgage. These bonds were placed in the Metropolitan National Bank of New York, for delivery to the subscribers to the $3,000,000 pool represented by the syndicate, as their assessments were paid. In consideration of this, the syndicate agreed to pay the firm $3,000,000 in cash. Brown, Howard

& Co. proceeded to organize the company under this contract, received from the syndicate the $3,000,000, and turned over to them the ten millions of stock and bonds, which were distributed among the members of the syndicate in proportion to their subscriptions to the pool. This first mortgage provided for was executed January 1, 1880, and was signed by the president and secretary of the company. Brown, Howard & Co., however, never furnished the $560,000 of equipment provided for in their contract, but, it seems, by subsequent agreement with the pool or syndicate committee, they were released from their obligation to furnish the equipment, and instead of it were required to make further expenditures on the railway property, which were said to have exceeded the $560,000, the firm accepting the notes of the railway company for the excess.

On July 7, 1880, the president of the Ohio Central Railroad Company, acting in his capacit' as president, ordered of the Brooks Locomotive Works of Dunkirk five locomotives, to be delivered in December, 1880, and January, 1881. On July 19 he ordered five others, and on August 22 four others. These were all ordered for the railroad company. On August 20 the first lease, known as Lease A, was executed between McGourkey and the railroad company. By this instrument the railroad company agreed to hire of the petitioner, as trustee, and he agreed to lease, 800 coal cars and 14 locomotives for the period of ten years from the date of the delivery of the same to the company, the company agreeing to pay him as rent $100,000 on the delivery thereof, and in addition thereto $40,000 per year, with interest thereon at 8 per cent; in case of default in the payment of any instalment of interest, the lessor reserved the right of entering upon the premises of the company, removing any of the locomotives and cars, selling them at public or private sale, and applying the proceeds upon any and all instalments of rent or interest thereon, not theretofore paid, for such cars, for the whole of said term, whether said instalments had then fallen due or not, and if there should prove a surplus after paying such rent, interest and expenses, the same should be paid to the company, but if there

should be any deficit, the company should be liable to pay the same upon demand. The company was to keep the property in good repair, and keep the name, number and plate or other marks, to wit: "Ohio Central Car Trust" or "O. C. C. T." fixed and retained upon each of the cars and locomotives for the purpose of making the ownership publicly known; also to keep all property insured against fire, loss payable to the trustee, and to replace any cars or locomotives lost by fire. Schedule A, referred to in the lease, was not actually annexed until February 23, 1881. The 14 locomotives were ordered, as above stated, by the president of the company, and marked "Ohio Central C. T.," and numbered from 17 to 30, inclusive. The 800 coal cars were also marked in the same manner.

Mr. McGourkey, who, by this and two other similar instruments, assumed to own and to lease to the railroad company this large amount of rolling stock, was not a manufacturer or dealer in locomotives or cars; he was not a resident of Ohio, nor engaged in the railroad business, and, so far as appears, never saw the property, at least until after it went into possession of the receiver, nor knew of the contracts which were made for its purchase. He was the cashier of the Metropolitan National Bank of New York, the correspondent bank of the Commercial National Bank of Cleveland, of which the president of the railroad company was also president. He had very little knowledge as to the origin of the car trusts, which he represented, and knew very little about the arrangements which were made for paying in and paying out the money; he says the understanding was that he was to have little or no trouble in regard to the details; "that B. G. Mitchell, who is present here, and who is connected with the bank, was to take charge of that part. . . . I mentioned to him [the president] that I was made trustee of this car trust, and I was sorry. He said Mr. Mitchell will attend to the details, and it will not give you much trouble." Beyond taking the receipts for the cars from the road, signing the subscription certificates and endorsing the payments, he appears to have had nothing to do with the transaction. In short, Mr. McGourkey was a mere figure-head. Mr. Mitchell, who attended to the details,

was secretary of the railroad company and a clerk in the Metropolitan National Bank; he had no more than Mr. McGourkey to do with ordering the cars, but attended to the finances of the trust. The names of the subscribers to the trust were given to him by three persons, who were all directors of the road. They instructed him to make a subscription certificate, which would be signed by the bank as fiscal agent, certifying that the holders would be entitled to so many thousand dollars of car-trust certificates when the several instalments were endorsed as paid in full. The subscription certificates were signed by the cashier, or stamped by him as paid for the cashier. The money received was credited to an account called the "Equipment account of the Ohio Central Railroad" in the Metropolitan National Bank, and was paid out to the president of the road, who had charge of buying the equipment, by transferring it to the account of the Commercial National Bank of Cleveland, of which he was also president; also by paying equipment notes issued by the equipment company, so called, which were endorsed individually by the president and one of the directors. Mr. Mitchell further says: "When these instalments were all paid on the subscription certificates, and a certificate from the general manager of the road with a schedule of the numbers and marks of the equipment under the several trusts which were on the road was returned to me, I turned them over to Mr. McGourkey and he certified to the car-trust certificates. These certificates I turned over to the several subscribers, as appeared on my record, cancelling their subscription certificates as they surrendered them." It appears from the testimony of the president that the men who furnished the money to purchase this equipment were most of them interested in the organization of the company; that it was all paid in New York except $50,000, which he subscribed himself; that the contracts were all made by him, or by his authority; that the moneys were received from the Metropolitan National Bank and credited upon the books of the Commercial National Bank to the Ohio Central Railroad Company, without distinguishing these moneys from others that were credited to the same company;

and that no separate accounts were kept with the car trusts. This account was drawn upon from time to time for the general purposes of the company, as well as for the payment of the rolling stock covered by the leases in question.

Mr. Mitchell, who appears to have been more familiar with these car-trust certificates than any one, except possibly the president of the company, says that the same persons who controlled the subscriptions for the $3,000,000 pool, also, to a certain extent, controlled the subscriptions for the equipment. "There were other subscribers, but they controlled the matter." And again: "There were different subscribers for the equipment to what there were for the main line, although many of them were the same." Again, in answer to the question who constituted the Ohio Central Car Trust, he mentioned the names of several gentlemen, all of whom were directors or connected with the organization of the road. Mr. Martin, himself a director, states: "I myself held about in the neighborhood of $150,000; Mr. Lyman, A. A. Low & Bros. had, I think, about the same amount, and Mr. Lyman would naturally speak for his friend A. M. White. I think he was in the pool for about $150,000." It is true that another director states: "The names of the various subscribers I do not recollect, but may say in a general way that they were a different class of persons from those who subscribed to the syndicate, or held the stock or bonds of the Ohio Central Railway Company." But he does not seem to have had that acquaintance with the details of the transaction which the other witnesses had, and his testimony is outweighed in that particular.

The car-trust associations were not corporations or partnerships, nor legal entities of any description, but were simply car-trust certificates in the hands of various persons, who were represented by the petitioner McGourkey. The 14 locomotives included in the schedule attached to the Lease A were those which had been ordered by the president of the railroad, before the organization of the first car trust, and were all delivered between December 20, 1880, and February 10, 1881, billed to the Ohio Central Railroad Company, and paid for by drafts drawn by G. G. Hadley, general manager,

upon H. G. Eells, assistant treasurer of the company at Cleveland. Of the 800 coal cars, 606 appear to have been purchased of the Lafayette Car Works, and paid for by the railroad company. These 606 cars were mostly received by the company during the fall of 1880. The remaining 194 coal cars were constructed by the Peninsular Car Works of Detroit under a contract made by Mr. Hadley, general superintendent, in the name of the Ohio Central Railroad Company; and 'they were paid for by the railroad company by drafts drawn by Mr. Andrews, the assistant treasurer at Toledo, where the cars were turned over to the company. These locomotives and cars were by direction of Mr. Hadley, the general manager, marked in large letters "Ohio Central," and in small letters "Ohio Central C. T.," either placed upon a small plate so as to be removed easily, or upon the end of the sill of the coal cars.

Lease B No. 1 was executed March 1, 1881, and is not substantially different from Lease A in its general provisions. Both provide for the leasing and equipment not then in existence, according to a schedule subsequently attached. By this instrument, petitioner assumed to lease certain coal cars for thirteen years from the date of delivery of the cars to the company; "said coal cars to be delivered as per the contract of the said George J. McGourkey with the said makers, and it is understood that the said George J. McGourkey shall in no way be liable for any delay that may arise in the delivery of the said cars by the said makers. And the said railroad company may, for convenience, make the contract direct with said makers." There was to be paid as rental $80,000 on the 1st day of September in each year for ten years, with interest at 8 per cent, at the Metropolitan National Bank, the said yearly instalments being evidenced by 800 obligations of $1000 each, of the Ohio Central Railroad Company maturing at different times, with interest coupons attached. There was a provision that, in a case of default in payment, McGourkey should have the right to take possession and remove all rolling stock and sell the same, "together with thirty thousand shares of $100 each of the capital stock of the Ohio Central

Coal Company, pledged by said lessees as security for the per-
formance of said contract, and the payment of the principal
and interest of the said rental certificates, at public or private
sale." There were other provisions similar to those contained
in Lease A, concerning the payment of the surplus to the
railroad company, its liability for any deficit, and its obliga-
tion to fix and retain upon each of the cars the words, " Ohio
Central Car Trust," or the initials, to wit, " O. C. C. T.," for
the purpose of making their ownership known, etc. There
was a further provision that in case all payments were
promptly made the coal cars should become the absolute
property of the railroad company, and the trustee should
make conveyance thereof on demand. The schedule, which
was not annexed to this lease until December 9, 1881, covered
1400 cars, 1000 of which were constructed under contracts
made by Mr. Hadley, general manager of the Ohio Central
Railroad Company, with the Peninsular Car Works of De-
troit, on January 3, 1881, two months before the lease was
executed. The manager of the Peninsular Car Works testi-
fied that the contracts were the result of personal conferences
with some of the railroad managers, in which it was men-
tioned that these cars were for the car-trust association, and
that directions were given to stencil the cars in such manner
as to show that they belonged to a car-trust association. Ten
of these cars were delivered to the company before the lease
was executed, and the residue after the date of the lease.
They all went into possession of the railroad company be-
tween February 26 and the early fall of 1881. They were
paid for by drafts drawn by the auditor of the company upon
H. P. Eells, assistant treasurer, presumably out of the moneys
transferred from the equipment account in the Metropolitan
National Bank of New York to the Commercial National
Bank of Cleveland. Two hundred and fifty of these cars
were built by the Michigan Car Company under a contract
made with the railroad company by correspondence during
the month of December, 1880, delivery to be made during the
months of April, May and June, 1881. On February 1, 1881,
Mr. Hadley, the general manager, instructed the builders by

letter to number the cars, and to letter them "Ohio Central" in large letters, and "Ohio Central C. T." in small letters on the side sill. They were to be delivered after the date of Lease B No. 1, and they were all paid for in the same manner as the other one .thousand cars. The remaining one hundred and fifty of these cars were built under a contract of the railroad company with the Peninsular Car Works, entered into on February 11, 1881, and were delivered in November, 1881, after the execution of the lease, and were paid for in the same manner. While no instructions appear to have been given as to numbering or lettering these cars, the testimony indicates that the same policy was pursued as before.

Lease B No. 2 was executed March 1, 1882, and covered 2500 coal cars, including the 1400 described in Lease B No. 1, 340 box cars and 13 locomotives, according to a schedule annexed to the lease, the date of which is not given. . The railroad agreed to pay as rental therefor $180,000 on the first day of March in each year, from 1885 to 1894, with interest thereon at 8 per cent per annum, payable semi-annually on the 1st day of March and September during each and every year during the term of twelve years, with the same right to take possession and sell as contained in the prior leases. The eighth paragraph of this lease provided that the railroad should "evidence by lithographed certificates or obligations the several annual payments for rentals hereunder due at the time of the maturity of said payments, as provided in this agreement, and having attached thereto interest coupons," etc., such certificates or obligations to be delivered to McGourkey *pro rata* as the rolling stock was delivered to the railroad. There was a further provision for the rolling stock becoming the absolute property of the railroad upon the payment of the instalments and interest. It also recited that the Ohio Central Coal Company had executed contemporaneously a mortgage of $1,000,000 upon its coal property as additional security for the payment of the car-trust certificates provided for, which was accepted for a down payment upon said equipment. There was a further provision that sufficient of these car-trust certificates to take up and replace the prior car-trust

certificates of the company, amounting to $600,000, were to be used by McGourkey, and the original car-trust agreements were to be cancelled, and the equipment covered thereby released under this agreement; but if the holders of the said prior certificates failed or refused to make the change, the railroad was only to issue $1,200,000 of certificates thereunder. If a portion of the holders of the prior certificates elected to exchange them for certificates issued thereunder, then to such extent the company would issue certificates thereunder in addition to said $1,200,000, it being the intent to maintain the aggregate of $1,800,000 in car-trust certificates issued. The 1100 cars mentioned in this lease, which were in addition to the 1400 included in Lease B No. 1, were manufactured under a contract with the Peninsular Car Works of Detroit, dated October 22, 1881, and were to be delivered in Toledo during the following winter. Subsequently to the making of this contract, and on November 25, it was modified by releasing the railroad company, and substituting the Ohio Central Car Trust Association, Series B, in its place. Provision was also made for payment at the option of the trust association in cash on delivery of lots of one hundred cars each, or in the paper of the association, endorsed by two directors of the road. This modification of the agreement was signed by the railroad company, by its president and also by McGourkey, as trustee, by D. P. Eells. These cars were paid for by notes of the Ohio Central Car Trust Association, Series B, signed by G. G. Hadley, general manager, and endorsed by the same two directors. All of these 1100 cars were delivered before the first of March, 1882, the date of the lease, except 110, which were delivered afterwards; and forty of the three hundred and forty box cars were delivered on January 26, 1882. These cars were thus contracted to be built by the car-trust association, and there seems to be no reason for supposing that the railroad company paid anything for their purchase.

Of the thirteen engines, eight were built by the Brooks Locomotive Works of Dunkirk, N. Y., under like contracts as were made with the Michigan Car Company and the Penin-

sular Car Company. The locomotive works were instructed to mark five of them " Ohio Central Car Trust, Series B." Three more were ordered on December 15, 1881, and on the following day the president of the railroad wrote the secretary of the company that he had inadvertently given the order as president of the Ohio Central Railroad Company; that the engines were for the Car Trust, Ohio Central Railroad, Series B. The remaining five of the thirteen, and the locomotive Bucyrus, were built by the Ohio Central Railroad Company in its shops at Bucyrus, for the Ohio Central Car Trust, Series B, and were paid for by moneys furnished by Mitchell, and charged to the equipment fund of the Ohio Central Railroad Company upon the books of the Metropolitan National Bank. The evidence sufficiently indicates that these engines were built under the agreement with the Ohio Central Car Trust Association, No. 2, represented by McGourkey as trustee, by which the railroad company was to build them at its shops, and to identify them as belonging to the car trust by proper labels, and were paid for out of money furnished by the car-trust certificates, represented by McGourkey.

The 340 box cars were delivered to the railroad prior to June 7, 1882. Forty of them appear to have been in the possession of the company before the date of the lease of March 1. It does not appear from the testimony how or from whom they were acquired by the railroad company, nor how nor out of what fund they were to be paid for.

In relation to this rolling stock, the president testifies that the understanding was that the railroad company expected to own this equipment, when all the car-trust certificates were paid, as the company had agreed to pay; that they had, therefore, a large interest in getting the best contracts they could for the purchase of the equipment; that he made all the contracts himself for such equipment, or authorized Mr. Hadley to make them, under the stipulation in the leases that the railroad company might make the contracts direct with the makers. It is somewhat difficult to see how the president could have acted as the agent of the car-trust certificates holders, or of McGourkey, in making the contracts for this

rolling stock, inasmuch as the greater portion of these contracts were entered into before the associations were formed, the leases executed, or the certificates issued.

The facts of this case, then, briefly stated are as follows: A syndicate of capitalists known as the three-million-dollar pool contracted with Brown, Howard & Co. for the purchase of certain lines of railroad for the purpose of organizing the Ohio Central Railroad Company. They raised three million dollars in cash, paid it to Brown, Howard & Co., and in return received four millions in stock and three millions in first-mortgage bonds and three millions of income bonds, a total of ten millions in stock and securities, which were distributed among the members of the syndicate according to their subscriptions. In further consideration of the three million dollars in cash, Brown, Howard & Co. agreed to complete and organize the road and furnish it with $560,000 of rolling stock. The latter provision was never complied with, though it is said they expended that amount for the benefit of the road. It does not satisfactorily appear what the actual value was of the ten millions in stock and securities turned over to the syndicate, although, in the opinion of the court below, it is said that they were "at the date of issuance or very soon thereafter worth in the market largely more by several millions than the sum of $3,000,000 paid out therefor." If the law were complied with the four millions of stock should have been represented by money or property to that amount, and if the market value of this stock were merely nominal it is probably because little, if anything, was ever paid upon it, and it was used merely as a method of retaining control of the corporation. It is safe to say that if the stock had been actually paid up in money or property, and the money raised by the bonds had been applied to the construction and equipment of the road, these securities would have been worth far more than the three millions of dollars that were paid for them, and the device of borrowing money upon car-trust certificates might not have been necessary. Evidently the syndicate took this stock without recognition of any obligation imposed upon them by their subscriptions to the same, but

looked upon it simply as a voting power in stockholders' meetings, and as a means of retaining control of the corporation. Finding that the road was in need of further equipment, and assuming that there was no other way of providing the money for that purpose, they proceeded to purchase rolling stock in the name of the road and to raise money by certificates issued to subscribers of an equipment fund. Had the directors of the road made a *bona fide* arrangement with the manufacturers to lease a certain amount of rolling stock for their equipment of this road there could be no doubt of the propriety of their action, though the arrangement had contemplated an ultimate purchase by the railroad.

The vice of this arrangement, however, consisted in the fact that the directors were, so far as it appears, the subscribers to most if not all these certificates, and had complete control of the purchase of the stock; and the money realized from them though kept in a separate account in the Metropolitan Bank, was mixed with the other moneys of the railroad company on the books of the Commercial Bank at Cleveland; that the rolling stock in question was purchased in the name of the road largely before the leases were made, and was paid for out of the money of the road thus deposited with the Commercial Bank; that so far from it appearing that the money raised upon these certificates went solely to the purchase of this rolling stock, it appears affirmatively by the minutes of a directors' meeting held at New York, March 1, 1882, that the company was indebted to the bank in the sum of $400,000, for a portion of which the president and one director were indorsers, an indebtedness created for the purpose of raising money for equipment *and other purposes;* that $1,200,000 of car-trust certificates were pledged to the bank as security for this indebtedness, and that the president and treasurer were authorized to liquidate the same out of the said certificates and their proceeds. How much of this indebtedness was incurred for equipment purposes was left entirely uncertain.

It also appears from the testimony of one of the directors that the estimated cost of the equipment for which these $1,200,000 of certificates were issued was but $850,000, and

that the remaining $350,000 was to be expended by the company at its pleasure.

The directors of this road were evidently acting in two inconsistent capacities. As directors, they were bound to watch and protect the interests of the road and obtain the rolling stock upon the most advantageous terms. As holders of the car-trust certificates or representatives of such holders, it was to their interest to lease the same at the best possible rate and to make sure that as directors this rolling stock should never become their property except at the highest price. In other words, they were both buyers and sellers or lessors and lessees of the same property.

No principle of law is better settled than that any arrangement by which directors of a corporation become interested adversely to such corporation in contracts with it, or organize or take stock in companies or associations for the purpose of entering into contracts with the corporation, or become parties to any undertaking to secure to themselves a share in the profits of any transactions to which the corporation is also a party, will be looked upon with suspicion. A leading case upon this subject is that of *Wardell* v. *Railroad Co.*, 103 U. S. 651, 658, wherein a committee of the board of directors of a railway company entered into a contract with a coal company, the stock of which was largely owned by directors of the railway company. The contract was held to be a fraud upon the latter. It was said by the court in this case that "all arrangements, by directors of a railroad company, to secure an undue advantage to themselves at its expense, by the formation of a new company as an auxiliary to the original one, with an understanding that they, or some of them, shall take stock in it, and then that valuable contracts shall be given to it, in the profits of which they, as stockholders in the new company, are to share, are so many unlawful devices to enrich themselves to the detriment of the stockholders and creditors of the original company, and will be condemned whenever properly brought before the courts for consideration." A somewhat similar case was that of *Gilman &c. Railroad* v. *Kelly*, 77 Ill. 426, in which it was held to be

unlawful for directors of a railroad company to become members of a company with which they have made a contract to build and equip the road, and that, in such case, the stockholders might at their election ratify the act, and insist upon the profits of the contract, or disaffirm it *in toto.* See also *Whelpdale* v. *Cookson*, 1 Ves. Sen. 9 ; *Drury* v. *Cross*, 7 Wall. 299 ; *York Buildings Co.* v. *McKenzie*, 3 Paton, 378 ; *Hoffman Steam Coal Co.* v. *Cumberland Coal Co.*, 16 Maryland, 456 ; *Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553 ; *Aberdeen Railway* v. *Blakie*, 1 Macqueen, 461 ; *People* v. *Overyssel Township Board*, 11 Michigan, 222 ; *Flint & Père Marquette Railway Co.* v. *Dewey*, 14 Michigan, 477.

A contract of this kind is clearly voidable at the election of the corporation; and when such corporation is represented by the directors against whom the imputation is made, and the scheme was in reality directed against the mortgagees, and had for its very object the impairment of their security by the withdrawal of the property purchased from the lien of their mortgage, it would be manifestly unjust to deny their competency to impeach the transaction. The principle itself would be of no value if the very party whose rights were sacrificed were denied the benefit of it.

In fine, we are of opinion that this transaction should be adjudged to be in law what it appeared to be in fact, a purchase by the railway of the rolling stock in question, and that the device of the car-trust certificates was inoperative either to vest the legal title in McGourkey, or to prevent the lien of the mortgage from attaching to it upon its delivery to the road. At the same time the holders of these certificates, who stand in the position of having advanced money toward the equipment of the road, and particularly those who purchased them for value before maturity, are entitled to certain rights with respect to the same which must be gauged in a measure by a consideration of the so called leases themselves. The title to this property being, as we hold, in the railroad company, obviously the petitioner is not entitled to rent; his position is that of one who has advanced money to a railroad company for the purchase of equipment with the understand-

ing, which, though not raised directly from the instruments themselves, may perhaps be implied from the nature of the transaction, that he was to have a lien upon certain rolling stock, to be thereafter designated upon a schedule to be furnished by the railway company. As the lien upon this property, evidenced by these leases, was acquired after the purchase of the property by the railway, and the property to which it was to attach was not designated until after it had passed into the possession of the company, and after the lien of the future-acquired property clause of the mortgage had attached to it, the lien of these certificates, if any there be, should be postponed to that of the bondholders.

If transactions such as this is claimed to be, could be sustained, there is nothing to prevent any syndicate of men, who obtain the capital stock of a railway, from organizing car-trust associations, and equipping the road with their own property, regardless of the capital which they may have at their disposal, and holding it as against the mortgagees. Persons investing their money in the bonds of railways in active operation do so upon the theory that their security consists largely in the rolling stock of the road, and hence any arrangement, by which the road is equipped with rolling stock belonging to another corporation, should be distinct, unequivocal and above suspicion. Much reliance is placed in this connection upon the fact that the leases provided that the railway company might contract, for the delivery of this stock, directly with the makers; that the property should be marked or stenciled in such manner as to indicate that it belonged to the car-trust associations, and that the mortgagees and the public were thereby duly apprised of the fact that it was no proper part of the equipment of the railway. Did the vice of these contracts lie in an attempted concealment of the actual facts, as is frequently the case where preferences are secretly reserved in assignments, there would be much force in this suggestion; but if it inheres in the very nature of the contract — if there be a thread of covin running through the web and woof of the entire transaction — in other words, if the purpose be unlawful, it is not perceived that an

open avowal of such purpose makes it the less unlawful. We do not wish to be understood as saying that the transaction in question necessarily involved actual fraud on the part of those participating in it. As before observed, contracts of this description, for the purpose of leasing rolling stock, are by no means uncommon, and it is not improbable that this syndicate may have taken it for granted that the raising of money by car-trust certificates, issued to themselves, or to those in confidential relations with them, was but another mode of accomplishing the same result. The law, however, characterizes the transaction as a constructive fraud upon the mortgagee.

We think the court below was correct in holding that these leases, so far as they are a security at all, must be treated as mortgages. Reading between the lines of these instruments, it is quite evident that no ordinary letting of property for a fixed rental was contemplated, but that the retention of title by the lessor was intended as a mere security for the payment of the purchase money. Thus, by Lease A there was to be a payment of a gross sum of $100,000 upon the delivery of the property, and an annual rental of $40,000, with interest at 8 per cent, with a further provision that if such payments were promptly made for the ten years specified, the property should belong to the railroad company without further conveyance. In case of default, however, the lessor made no provision for resuming his title to the property, but merely for the resumption of possession for the purpose of sale, as in an ordinary foreclosure of a mortgage. All these provisions are inconsistent with the idea of an ordinary lease of personal property.

Lease B No. 1 contained similar provisions, with a further stipulation that in case of default in payment the petitioner should have the right to sell the property, together with thirty thousand shares, of $100 each, of the capital stock of the Ohio Central Coal Company, pledged by such lease as security for the performance of the contract. The inconsistency of these contracts with an ordinary lease becomes the more apparent in the case of Lease B No. 2, which covered fourteen hundred coal cars, included in the former leases, and provided for the

taking up and replacing of the prior car-trust certificates to the amount of $600,000, and in case of refusal to make the exchange, for the issue of twelve hundred thousand of certificates, which were to be used to pay a debt to the bank to the amount of $400,000, and also to pay a contemplated loan of $350,000 to aid the railroad in developing its coal property and in its general business, leaving only the remainder to be applied to the purchase of the equipment. Instructive cases upon the relative rank of railway mòrtgages and instruments of this description are *Hervey* v. *Rhode Island Locomotive Works*, 93 U. S. 664; *Murch* v. *Wright*, 46 Illinois, 488; *Heryford* v. *Davis*, 102 U. S. 235; *Frank* v. *Denver &c. Railway Co.*, 23 Fed. Rep. 123.

The court below held that the petitioner had shown a superior right to three engines included in the schedule to Lease B No. 2, and as no appeal was taken by the defendant from this decree, of course it is not entitled to complain of this finding in this court. The court further found that, so far as the petitioner had established any right to or lien upon the property in controversy, regarding him as a mortgagee, it appeared that he had already been paid by the company and the receiver more than he was entitled to, and his claims for further payments and additional compensation were disallowed. We see no reason to question this finding, and, as we are of opinion that the court was correct in holding the rights of petitioner subordinate to those of the first mortgage bondholders, its decree dismissing the petitions is, therefore,

*Affirmed.*

The CHIEF JUSTICE and MR. JUSTICE BREWER dissented.