# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

## CONTRACTING & BUILDING CO. OF KENTUCKY v. CONTINENTAL TRUST CO. OF NEW YORK.

(Circuit Court of Appeals, Sixth Circuit. November 7, 1900.)

### No. 773.

1. RAILROADS—MORTGAGE—AFTER-ACQUIRED PROPERTY—SALE OR LEASE OF LOCOMOTIVES.

   Locomotives were delivered to a railroad company on payment of a specific amount, and the execution to the builders of 12 obligations, called "lease warrants," maturing at monthly intervals, up to a specified date. The instrument evidencing the transaction was in the form of a lease; the payments made, and to be made, being called "rentals." The legal title remained in the so-called "lessor," and the contract provided that, on payment of the last lease warrant, the lessee might, at its option, purchase the locomotives for one dollar, on payment of which the lessor was to execute a bill of sale thereof to the lessee. *Held*, that the real transaction was a bargain and sale, title being retained as security for the purchase money, and that, the locomotives being property susceptible of separate ownership and separate liens, they passed, subject to the vendor's lien, under the after-acquired property clause of an existing mortgage of the railroad covering all future acquisitions of locomotives, and the lien thus acquired by the mortgagees could not be displaced by any subsequent agreement to which they were not parties.

2. SAME—LOAN TO PAY INTEREST ON MORTGAGE COUPONS—LENDER'S RIGHT TO PREFERENCE OVER MORTGAGE.

   That money was borrowed to pay interest on matured railroad mortgage coupons is no ground for giving the lender a preference over the mortgage: and this, though the loan was necessitated in part by the application of current income to the payment of the purchase money for locomotives which became subject to the mortgage under an after-acquired property clause.

Appeal from the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

The appellant is a creditor of the Toledo, St. Louis & Kansas City Railroad Company, holding six notes, for $10,000 each, which matured in May and June, 1893, and are renewals of notes originally made January 6, 1892, payable to the order of S. H. Kneeland, and indorsed by him. The railroad company became insolvent, and in May, 1893, a receiver was appointed by the court below, upon a bill filed by general creditors. Subsequently, and in

108 F.—1

December, 1893, the trustees, under a mortgage securing an issue of bonds, filed their foreclosure bill in the same court. The two bills were consolidated under the title of the latter, and the receivership extended to both suits. This intervening petition was filed October, 1893, in the original case. The intervener, now the appellant, claimed preference in the payment of its demands upon two grounds: First, as the assignee of the legal title to 10 locomotives, then in the possession of the receiver; second, because the notes were given for money loaned the company to aid it in paying maturing interest upon its mortgage bonds, thus preventing default. The petition was referred to Irvin Belford, as special master, to report upon the facts and law. The master, in a very able report, denied to petitioner any lien upon the locomotive engines superior to that of the mortgage bondholders, and any preference over the bondholders, either in the income of the receivership or the corpus of the mortgaged property. This report was excepted to by the appellant, which exceptions on final hearing were overruled, the report confirmed, and a decree entered denying all preference to the intervener. From this decree this appeal has been taken.

E. D. Potter and Thomas Emery, for appellant.

Edwin T. Rice, Jr. (E. C. Henderson, of counsel), for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The claim to a lien superior to the lien of the mortgage bonds upon the locomotive engines is not well founded. The Rhode Island Locomotive Works sold to the railroad company in June, 1891, 10 locomotives, for the consideration of $89,500. Of this, $17,900 was paid in cash upon delivery. For the remainder, 12 obligations, called "lease warrants," were executed, each for $5,966, which matured at monthly intervals, up to June 13, 1892. The instrument evidencing this transaction was in the form of a lease; the payments made, and to be made, being called "rentals." The legal title remained in the so-called "lessor." The contract provided that "the lessee may, at its option, at any time within one month after the maturity and payment of said last lease warrant, purchase said locomotives at the price of one dollar, and, upon payment of said sum to it, the lessor shall thereupon, by a bill of sale, convey said locomotives to said lessee." Eleven of these "lease warrants" were paid prior to June, 1892. The twelfth and last was by agreement extended to November 13, 1892. In June, 1892, S. H. Kneeland, largely interested as a stockholder in the railroad company, undertook, at the instance of the company, to raise a loan of $60,000 to aid it in meeting interest upon its mortgage bonds. Passing over much that is immaterial, the master reported that he accomplished this by having executed to him the 10 notes, each for $10,000, which were the originals of those in suit. Kneeland then induced the Rhode Island Locomotive Works to execute an assignment in blank of the above-mentioned lease contract, by which it assigned "all its right, title, interest, and property in and to said locomotives, and in and to all of its rights and authority under said agreement, subject, however, to said outstanding lease warrant maturing November 13, 1892, and to all securities and remedies under said contract of June 5, 1891, so far as the same may be necessary for the collection of said lease warrant." This assignment is dated June 6, 1892, and at the foot thereof the railroad company executed an assent thereto.

At this time the master reports that Kneeland was personally indebted to C. P. Huntington in an unknown amount, for the payment of which Huntington held $36,000 of the first mortgage bonds of the railroad company, and $500,000 in the common stock of the company, owned by Kneeland, and pledged by him to Huntington to secure a personal debt. The railroad company delivered to Kneeland the blank assignment above mentioned, together with its six notes above described, and authorized him to use them in procuring for the company the sum of $60,000, to be applied in the payment of interest on bonds then due. Huntington then exchanged the stocks and bonds so held by him for the said notes and the assignment of the so-called "lease contract" with the Rhode Island Locomotive Works, with the understanding that Kneeland would use the securities surrendered to him in raising the money needed by the company. Kneeland did this, and paid into the credit of the company $60,000, which was used, with other funds of the company, in paying interest coupons maturing June 1, 1892. The blank in the assignment of the lease contract was filled in with the name of the intervener and the notes of the company indorsed to it. This was done through direction of Huntington, under some unexplained plan, but all parties have treated the intervener as standing in all respects in the shoes of Huntington. At the time of the purchase of the locomotives from the Rhode Island Locomotive Works, and at the time of the assignment of the contract under which they were obtained, the entire property of the railroad company was under the recorded mortgage herein being foreclosed. This mortgage contained a full and sweeping after-acquired property clause, covering all future acquisition of locomotives or other equipment. The master reports that neither the trustees in that mortgage, nor the holders of the bonds secured thereby, were parties to this scheme for raising money to pay interest, or had any knowledge of it. Pending this intervention, the last of the "lease warrants" was paid off by the receiver herein, under direction of the court, and thereupon a bill of sale was executed by the Rhode Island Locomotive Works to the railroad company.

It is too obvious for discussion that the arrangement under which the railroad company acquired the 10 locomotives in question was no ordinary letting of property for a fixed rental, and that no such thing was really contemplated, and that the retention of title was intended as a mere mode of securing the payment of the purchase price. The real character of such transactions has been often the subject of judicial construction, and their rank in relation to the claim of creditors considered with reference to the registry laws of the states within which the property is situated. Hervey v. Locomotive Works, 93 U. S. 664, 23 L. Ed. 1003; Heryford v. Davis, 102 U. S. 235, 26 L. Ed. 160; McGourkey v. Railroad Co., 146 U. S. 536, 13 Sup. Ct. 170, 36 L. Ed. 1079. The real transaction was a bargain and sale, the title being retained as security for the purchase money. Being property susceptible of separate ownership and separate liens, it passed under the after-acquired property clause of the existing mortgage, subject to the lien of the vendor; the existing mortgagees not being purchasers for value in respect of such after-acquired property. Harris v. Bridge

Co., 33 C. C. A. 69, 90 Fed. 322; U. S. v. New Orleans R. R., 12 Wall. 362, 20 L. Ed. 434; Myer v. Car Co., 102 U. S. 1, 26 L. Ed. 59; Fosdick v. Car Co., 99 U. S. 256, 25 L. Ed. 339; Kneeland v. Trust Co., 136 U. S. 89, 95, 10 Sup. Ct. 950, 34 L. Ed. 379. The lien thus acquired by the mortgagees could not be displaced by any subsequent agreement to which they were not parties. Evans v. Kister, 35 C. C. A. 28, 92 Fed. 828. It follows that the assignment of the so-called "lease contract" was unavailing, as against the antecedent mortgage lien.

2. That the money was borrowed to pay interest upon matured mortgage coupons is no ground for giving a preference over such mortgagees. In Morgan's L. & T. R. & S. S. Co. v. Texas Cent. R. Co., 137 U. S. 171, 196, 11 Sup. Ct. 61, 34 L. Ed. 625, the court, speaking by Chief Justice Fuller, said:

"But if the advances could therefore be treated as having been specifically procured for, or specifically applied to, the payment of interest as such (although there is no evidence to that effect), still such payment would afford no basis for the assertion of a preference as against the bondholders. So far as disclosed, the interest coupons were paid, not purchased (Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472), and cannot be set up as outstanding; and the contention is wholly inadmissible that the bondholders, because they received what was due them, should be held to have assented to the running of the road at the risk of returning the money thus paid, if the company, by reason of unrealized expectations on the part of those who made the advances, should ultimately turn out to be insolvent, and unable to go on. By the payment of interest, the interposition of the bondholders was averted. They could not take possession of the property, and should not be charged with the responsibility of its operation."

This case has not been overruled or shaken by any subsequent decision of which we are aware.

That the necessity for borrowing money to pay interest was in part a consequence of the application of current income to the payment of the purchase money for the locomotives bought from the Rhode Island Locomotive Works does not strike us as raising an equity superior to that of the mortgagees in favor of one who loaned money for the specific purpose of paying interest. The interest coupons were paid by the application of the borrowed money, and no right of subrogation to the lien of the coupon exists. The money was not used in paying off the vendor's lien upon the locomotives, and hence there can be no possible subrogation to that lien.

If a lender of money, for the express purpose of paying the current operating expenses of a railroad, and thereby keeping it a going concern, does not bring himself within the class of creditors entitled to a preference over an existing mortgage debt, as was expressly decided in Morgan's L. & T. R. & S. S. Co. v. Texas Cent. R. Co., it is difficult to see the higher equity of one who lends money to pay mortgage interest to prevent foreclosure over those who were thereby prevented from asserting the lien of their mortgage. Why mortgagees, who received thereby only what was due them, should now be required to pay back the money thus paid them to those who loaned the money to the railroad company for that very purpose, is not comprehensible. The decree was right, and must be affirmed.