### MANSON v. DAYTON et al.

### JARMUTH v. SAME.

(Circuit Court of Appeals, Eighth Circuit.   January 24, 1907.)

#### Nos. 2,427, 2,428.

**1. EVIDENCE—CONTRACTS—VARIANCE OF WRITING BY PAROL.**

In the adjustment of private reciprocal rights, where the parties have deliberately put into writing their mutual convention, such expression of their intention and understanding is final and conclusive, and cannot be varied or controlled by any antecedent negotiations or declarations in pais.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 1756.]

**2. PROPERTY—REAL OR PERSONAL—MANNER OF TREATMENT BY OWNER.**

Slag, dumped as refuse from an ore smelter or mill while ordinarily appurtenant to the land on which it is dumped, may be treated by the owner of both the land and dump as personalty, and may be sold and delivered as such.

3. SALES—CONTRACT FOR CONDITIONAL SALE—REMEDY OF SELLER FOR BREACH.

Where the right to reclaim property conditionally sold is reserved to the seller in the event of the failure of the purchaser to make payment of any installment of the purchase price, he may not retake and appropriate the property, and also recover the unpaid installments of the purchase price; but his remedy is in the alternative, unless the contrary is so clearly provided as to leave no reasonable doubt that such was the intention of the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1418–1438.]

4. SAME—CONSTRUCTION OF CONTRACT.

The owner of land on which there were dumps of slag and smelter products entered into a contract denominated a "lease," by which he purported to lease the land for a stated term, with the right to remove the dumps on payment of a series of notes maturing at intervals through a portion of the term. The contract provided, in effect, that removal of the dumps should proceed only in proportion as payments were made, that when all the dumps were removed the lease should terminate, and that on payment of all the notes on or before maturity the lessee should be entitled to a bill of sale of the dumps, with the right to remove the same within a specified term. It further provided that: "It is mutually agreed that all work on the said above described slag, slag dumps and materials and smelter products shall be performed in a thoroughly workmanlike manner, and that any failure of the said party of the first part to do or keep any of the agreements herein, * * * or any failure to pay immediately when due any one or more of said 100 promissory notes, * * * shall work a forfeiture of all rights of the said party of the first part under this agreement, and the said party of the second part shall have the right * * * to declare each and every one and all of the said 100 promissory notes, or whatever number of the said notes may remain unpaid, * * * immediately due and payable, and * * * to collect the same, * * * and in case of forfeiture as aforesaid all work done and money expended by the said party of the first part shall inure to the party of the second part as liquidated damages, * * * and the said party * * * may thereupon * * * enter upon said premises and dispossess all persons occupying the same." Held, that such transaction was not a lease, but a conditional sale of the material in the dumps, which gave the owner alternative remedies for breach of the contract, and that, where he declared a forfeiture and took possession because of default in payment of notes, he could not also collect the notes maturing thereafter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1327–1331, 1431.]

5. CONTRACTS—CONSTRUCTION—SUBSTITUTING "OR" FOR "AND."

To prevent an absurd or unreasonable result, the word "and," used in a contract, may be read "or," or vice versa.

Sanborn, Circuit Judge, holds that the contract gave the seller the right to collect the entire purchase price, and also to retake and hold the property sold, but concurs in the result on the ground that such provision was so unconscionable that it would not be enforced by a court of equity or bankruptcy.

Appeal from the District Court of the United States for the District of Colorado.

On the 23d day of March, 1905, an agreement in writing was entered into between the Independence Smelting & Refining Company, a corporation of Colorado, as party of the first part, and Adolph J. Jarmuth, of Denver, as party of the second part, the essential parts of which contract are as follows:

"That the said party of the second part, for and in consideration of the sum of one dollar to him in hand paid by the said party of the first part, the receipt whereof is hereby acknowledged, and for and in consideration of the further sum of forty-nine thousand and nine hundred and fifty ($49,950) dol-

lars, to be paid according to the tenor of one hundred (100) certain promissory notes made by the said party of the first part to the said party of the second part, each of the said notes being of even date herewith, and each of said notes being for the principal sum of five hundred ($500) dollars, except that certain promissory (note) falling due the 28th day of January, 1907, which shall be for the principal sum of four hundred and fifty ($450) dollars, and for and in consideration of the agreements and undertakings of said party of the first part herein expressed, has demised and let unto said party of the first part, for the purpose of taking and using, for a term of five years and no longer, commencing March 28, A. D. 1905, and ending March 28, 1910, all the slag, slag dumps and all materials and smelter products, belonging to said first party, situated upon the following described land at Golden, Jefferson County, Colorado: [Here follows a description of the land by metes and bounds]; being the slag, slag dumps and all materials and smelter products situated about three thousand (3,000) feet southwesterly from the smelter now operated by said first party.

"And the second party, for the consideration named herein, hereby grants to said first party, its agents and employees, free access to said slag, slag dumps and all materials and smelter products upon said land, and full and free right of way over, upon and across said land at any and all parts thereof, for wagons and wagon roads, tramways and tramway tracks, railways and railway tracks, aerial tramways, pole lines and bucket lines during the term of this lease, for the purpose only of loading, taking out and carrying away said slag, slag dumps and all materials and smelter products in accordance with the terms and objects of this agreement, provided, however, that this lease shall terminate as soon as all the slag, slag dumps and all materials and smelter products shall have been removed from said land, whether the said five years shall have expired or not."

Provisions reserving right of access in party of second part.

Further provision regarding the method of working and removing the slag and smelter products, in blocks of 100 feet parallel with the tracks of the Colorado & Southern Railway.

Provision as to the payment of the notes consecutively, and, after May 8, 1905, within six weeks after maturity, with interest after maturity at 1 per cent. per month, "providing no slag, slag dumps or other materials or smelter products shall be removed from said land by said first party after any of the said notes are past due one week and unpaid"; with the further agreement that, if the first party desires an extension of any note, written notice shall be served upon the second party by registered letter or in person, before the maturity of such note.

Then a provision regarding the discount of any one or more of the notes, by payment before maturity.

"It is mutually agreed that all work on the said above described slag, slag dumps and materials and smelter products shall be performed in a thoroughly workmanlike manner, and that any failure of the said party of the first part to do or to keep any of the agreements herein, including the above described agreement to work said slag dumps in blocks of one hundred (100) feet, or any failure to pay immediately when due any one or more of the said one hundred (100) promissory notes maturing on or before the 8th day of May, 1905, or failure to pay the rest of said one hundred (100) promissory notes within six weeks after the same becomes due according to the tenor of the same, provided notice of extension, as aforesaid, shall have been given, or the taking or using of more than five hundred (500) tons per week of and from the said slag dumps as hereinafter provided while any (one) or more of the said one hundred (100) notes shall remain unpaid, shall work a forfeiture of all rights of the said party of the first part under this agreement, and the said party of the second part shall have the right, on giving a three days' written notice to the said party of the first part to declare each and every one, and all of the said one hundred (100) promissory notes, or whatever number of the said notes may remain unpaid, given to pay for the within lease, immediately due and payable, and shall have the right, immediately, to collect the same from the said party of the first part and in case of forfeiture as aforesaid, all work done and money expended by the said party of the first part shall inure to the benefit of the said

party of the second part as liquidated damages for the failure of the said party of the first part to keep the agreements in this writing; and the said party of the second part, or his agent, may thereupon, with or without demand of possession in writing, enter upon said premises and dispossess all persons occupying the same, with or without force, and with or without process of law, or, at the option of said party of the second part, the said party of the first part, its officers or agents, and all persons found in occupation, may be proceeded against as guilty of unlawful detainer."

Provision that in case of forfeiture the first party shall have 15 days thereafter to remove improvements, etc., placed by it upon said land for the purpose of the lease.

Provision that in case the first party shall be unable to carry out said contract by reason of acts of God, accidents, strikes, fire or causes beyond the control of the first party, affecting the smelter plant at Golden operated by it, the times for the maturity and payment of said notes shall be extended for a period not exceeding 90 days in the aggregate, "provided, however, that said first party shall not remove or take away from said land any of said slag, slag dumps or other materials or smelter products hereby leased during the time in which the said notes shall be extended as aforesaid."

"And in consideration of the acceptance of the foregoing lease and the expenditures to be made hereunder, and the well and faithful keeping of the covenants hereof, the said party of the first part shall have the right to purchase the said slag, slag dumps and other materials and smelter products by the payment, on or before the said 28th day of January, A. D. 1907, to the said party of the second part, in addition to the payment of all of the aforesaid one hundred (100) promissory notes, aggregating the payment of said sum of forty-nine thousand nine hundred and fifty ($49,950) dollars, part consideration, as aforesaid, of the within lease, of the further sum of fifty ($50) dollars.

"And the said party of the second part shall, at the time of the signing of the within lease and bond, make and execute unto the said party of the first part a good and sufficient bill of sale to all the hereinabove described slag, slag dumps and other materials and smelter products situated on the said above described land, which said bill of sale shall give said first party until the 28th day of March, 1910, to remove said slag, slag dumps and all materials and smelter products, and shall be deposited, together with a copy of this agreement, in the United States National Bank, in the city and county of Denver, state of Colorado, in escrow, to be delivered to the said party of the first part, or its assigns, on the payment in full of the aforesaid notes and said sum of fifty ($50) dollars, on or before the 28th day of January, 1907, as evidenced to the United States National Bank by the presentation of the said one hundred (100) notes cancelled."

Provision regarding the execution to the second party by the first party of said 100 notes; the first falling due on or before Monday, March 6, 1905, and the others each succeeding Monday thereafter, for 100 weeks, each of said notes to be for $500, except the note falling due on or before January 28, 1907, which shall be for $450, and each of said notes bearing no interest, except at 1 per cent. per month after maturity.

Memorandum of fact that the first party has, prior to the signing of the agreement, already used about 1,000 tons of slag from said slag dump, without payment; and that only in the event of forfeiture of all rights under the agreement shall the second party be entitled to compensation for said slag.

"It is further understood and agreed by and between the parties hereto that the said party of the first part, while any one or more of the said one hundred (100) promissory notes shall remain unpaid, shall not take or use more than at the rate of five hundred (500) tons per week of and from the said slag, slag dumps and other materials and smelter products."

Provision that time is of the essence of the agreement, and the covenants to bind the heirs, executors, administrators, successors, and assigns of the parties.

After the execution of said contract, the said company took possession of said dump and proceeded to remove about 3,867 tons thereof, and paid to the said Jarmuth the sum of $4,500, represented by the first notes. The purchase

price of the dump being about $1 per ton, the company more than fully paid
for the amount removed.

On May 12, 1905, Jarmuth notified the said company, in writing, that they
had failed to pay, when due, the promissory note for the sum of $500 maturing
on the 8th day of May, 1905; and that within three days after the service of
the written notice, according to the provisions of the contract, he would de-
clare all of the 100 promissory notes referred to in the agreement, given to
pay for the lease, remaining unpaid, immediately due and payable. And there-
after, on the 17th day of May, 1905, he gave to the company written notice of
the failure to pay the note as aforesaid, and of the giving of the notice of
May 12, 1905, and declared each and every one of said promissory notes "given
to pay for the said lease, and now remaining unpaid, immediately due and
payable, and you are hereby further notified that I do hold you liable to and
for all the obligations, forfeitures and liquidated damages mentioned in said
agreement of lease, etc., of date March 23, 1905." Shortly thereafter the said
Jarmuth re-entered and took possession of said property and appropriated the
same to his use and benefit.

On August 18, 1905, the said company was adjudged a bankrupt in the
United States District Court for the District of Colorado. On September 5,
1905, the appellant, William O. Manson, presented for allowance against the
estate in bankruptcy a claim for the sum of $44,450, based on 89 of the unpaid
promissory notes in the sum of $500 each, except one for $450; and the said
Jarmuth presented for allowance against the estate one of said unpaid prom-
issory notes for the sum of $500. The consideration recited in Manson's proof
of claim for the execution of the notes was that he had sold to said Jarmuth
certain real estate and personal property in Jefferson county, Colo., in return
for said 89 promissory notes and others executed by the Independent Smelting
& Refining Company under date of March 23, 1905, prior to the bankruptcy,
which were delivered to said Jarmuth in return for an agreement of five years'
lease and bond of the same date, for "all the slag, slag dumps, and all materi-
als and smelter products." The consideration for Jarmuth's note was alleged
to be cash paid for said note to said Manson; the facts being that said Man-
son was the real party in interest in the contract respecting the sale of said
dump or slag to said company—Jarmuth having rather a representative inter-
est than a real one.

The referee disallowed these claims, on the principal ground that the ven-
dor or lessor, whatever he may be termed, after re-entry and reclaiming the
slag, which was the consideration for the notes, was not entitled also to col-
lect the full amount of the purchase money. This finding of the referee was,
on review, affirmed by the District Court. To reverse these judgments the
said claimants have prosecuted separate appeals. As the cases depend upon
the same facts and principles of law, they will be disposed of in one opinion.

Edward P. Costigan (Horace N. Hawkins, on the brief), for ap-
pellants.

Daniel B. Ellis and Jesse H. Sherman (Henry T. Rogers, Lucius M.
Cuthbert, Lewis B. Johnson, and Charles A. Stokes, on the briefs),
for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and
PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered
the opinion of the court.

On the hearing of the claims before the referee in bankruptcy, there
was considerable testimony offered respecting the negotiations between
the parties preceding the execution of the written agreement in ques-
tion. The settled rule of law is that all bargainings, proposals, and
counter proposals of the parties preceding and leading up to the execu-
tion of the written contract are conclusively presumed to be expressed

in the written instrument. Any and all matters discussed between them, or their understandings not contained in the writing, are presumed to have been abandoned or changed in the ultimate expression of the minds of the parties. Therefore the terms of the contract, in the absence of fraud or mistake, cannot be varied or controlled by any antecedent negotiations or declarations in pais. It is the concensus of the best considered cases that in the adjustment of private, reciprocal rights, where the parties have deliberately put to writing their mutual convention, such expression of their intention and understanding is final and exclusive. Tait's Evidence, 326, 327; 1 Greenleaf on Evidence, § 275; Bast v. Bank, 101 U. S. 96, 25 L. Ed. 794; Pearson v. Carson, 69 Mo. 550; State ex rel. Yeoman v. Hoshaw, 98 Mo. 358, 11 S. W. 759; Tracy v. Union Iron Works Company, 104 Mo. 193, 16 S. W. 203.

It, therefore, only remains to determine what is the true import of the terms employed by the parties in the written contract in question. The claimant, William O. Manson, was interested in a large quantity of slag, dumped from an ore smelter or mill, which he desired to sell, and which the Independent Smelting & Refining Company wished to buy. Adolph J. Jarmuth seems to have been but a dummy for Manson in the transaction. After much dallying in the negotiations, the sale or transfer took the final form of said written agreement.

Question is made as to whether this slag or dump was regarded by the parties as real or personal property. It may be conceded that material of this character, dug from the earth and deposited on the surface thereof, adheres to and becomes appurtenant to the land, and ordinarily belongs to the owner of the fee; but it is equally the law that the owner of material like slag, the refuse of mineral deposit dug from the earth, run through a mill, and then dumped on the surface of contiguous land, may be treated and dealt with as mere personalty, which the owner may sell and deliver as any other personal property susceptible of manual delivery.

"Though there is no actual physical severance, articles and structures which have become part of the realty by annexation may be made to resume their character of personalty by acts of the landowner alone, or in conjunction with others, which will be effective at least as between the parties to the transaction. A severance may be brought about by the treatment of articles annexed as personalty by the persons interested therein." 13 Am. & Eng. Enc. of L. (2d Ed.) p. 616.

There is no estate or right of any kind conveyed or conceded to the realty upon which the slag was deposited, except a right of way for the purpose only of loading, taking out, and carrying away the slag.

It is not essential, where the article is to be removed by the purchaser, that the sale should be evidenced by deed of conveyance, and so the parties to this transaction regarded and treated the slag. It was provided in the contract that simultaneously with the execution of the contract the party of the second part should "make and execute unto the said party of the first part a good and sufficient bill of sale to all the described slag, slag dumps, and materials and smelter products situated on said above-described land, which said bill of sale shall give

said first party until the 28th day of March, 1910, to remove said slag, slag dumps, and all materials and smelter products, and shall be deposited together with a copy of this agreement in the United States National Bank * * * in escrow, to be delivered to the said party of the first part, or its assigns, on the payment in full of the aforesaid notes," etc.

It matters little what name parties to such contracts may give the transaction. Mere names are often insignificant; sometimes they are not even descriptive. The words "bond and lease" have become so stereotyped in contracts in Colorado, touching mines and mining material, that they are at times employed where they have no relation to the proper legal significance of the terms. To call a simple unsealed contract a "bond" does not make it a bond. To call a contract a "lease," which has for its underlying purpose the sale of property on specified conditions, intended to secure the payment of the purchase money and for the better protection of the vendor in case of reclamation of the property, does not create a lease. Nor does calling the installment payments therefor, "rent," create the relation of landlord and tenant between the parties. The amount of purchase money in this case was named in round numbers, and, if on the day of the execution of the contract the conditional purchaser had tendered the whole contract price, the property would have passed to it beyond the power of the vendor to revoke. The only remaining obligation of the purchaser, then, would have been to remove the slag within the specified time.

This transaction was not a lease, for the reasons: (1) The deferred payments did not cover the entire period of occupancy for the removal of the slag; (2) the contract gave the company the right not only to remove, but to absolutely consume, the slag, if only it paid its notes, without any provision for the return of the slag at the end of the so-called term; and (3) the time of occupancy of the premises was to end when all the slag should be removed.

In Hervey v. R. I. Locomotive Works, 93 U. S. 664, 672, 23 L. Ed. 1003, the court, in discussing a transaction respecting the transfer of personal property to be paid for in installments, retaining the title by the vendor until the payments were made, said:

"Nor is the transaction changed by the agreement assuming the form of a lease. In determining the real character of a contract, courts will always look to its purpose, rather than to the name given to it by the parties."

Then referring to the case of the sale of a piano, reported in Murch v. Wright, 46 Ill. 488, 95 Am. Dec. 455, the court said:

"The court held 'that it was a mere subterfuge to call this transaction a lease,' and that it was a conditional sale, with the right of rescission on the part of the vendor, in case the purchaser should fail in payment of his installments. * * * It is true the instrument of conveyance purports to be a lease, and the sums stipulated to be paid are for rent; but this form was used to cover the real transaction."

In Contracting & Building Co. of Kentucky v. Continental Trust Co. of New York, 108 Fed. 1, 47 C. C. A. 143, locomotives were delivered to a railroad company on payment of a specific amount and the execution to the builders of 12 promissory obligations, called in the

contract "lease warrants," maturing at intervals of one month up to a specified date. The written instrument was in the form of a lease, in which the installment payments were called "rentals," with the legal title retained in the so-called lessor. The contract further provided that on the payment of the last lease warrant the lessee might, at its option, purchase the locomotives for $1, on the payment of which the lessor was to execute a bill of sale therefor to the lessee. Judge Lurton observed of that:

"It is too obvious for discussion that the arrangement under which the railroad company acquired the 10 locomotives in question was no ordinary letting of property for a fixed rental, and that no such thing was really contemplated, and that the retention of title was intended as a mere mode of securing the payment of the purchase price. The real character of such transactions has been often the subject of judicial construction, and their rank in relation to the claim of creditors considered with reference to the registry laws of the states within which the property is situated. [Citing authorities.] The real transaction was a bargain and sale; the title being retained as security for the purchase money. Being property susceptible of separate ownership and separate liens, it passed under the after-acquired property clause of the existing mortgage, subject to the lien of the vendor," etc.

In Unitype Company v. Long, 143 Fed. 315, 74 C. C. A. 453, the contract was in the form of a lease of a machine for the term of three years, for a total rental of $1,260, payable in monthly installments, for which notes were given, with an option to the lessee to extend two years more at the same rental and to buy the machine at any time during the three years for $1,700, less the amount paid in rental. It was held to be nothing more than a conditional sale of the machine. The court said:

"Although called a lease, the transaction was intended to be, and in effect was, a conditional sale; the vendor reserving the title until the final payment should be made, and the right of rescission, in case the purchaser should fail in the payment of any installments of the so-called rent, or an additional amount to make the total sum $1,700."

The same view of such transaction obtains in the state of Colorado. Gerow v. Costello, 11 Colo. 561, 19 Pac. 505, 7 Am. St. Rep. 260.

It is the universally recognized rule of law, instinct with the spirit of justice, that where a right to reclaim property conditionally sold is reserved to the vendor in the event of the failure of the vendee to make payment of any installment due on the purchase price, he may not retake and appropriate the property and also recover the whole purchase price; and the retaking of the property by the seller defeats his right to recover unpaid installments. "A vendor under a conditional sale cannot have both the property and the purchase price. Where he has elected to retake the property absolutely, the consideration for the obligations or security given for the purchase price fails, and he can neither collect upon the one nor enforce payment of the other." White v. A. W. Gray's Sons, 89 N. Y. Supp. 481.

In Seanor v. McLaughlin, 165 Pa. 150, 30 Atl. 717, 32 L. R. A. 467, the plaintiff delivered to the defendant certain machines, the price of which was $1,700, retaining the title. On payment of $750 the agreement was to pay the balance in three yearly payments. The contract provided that the plaintiff could resume possession of the machines

on default, and for that purpose enter the defendant's premises. The defendants concurrently therewith gave the plaintiff a judgment bond for $1,000 for such installments, as collateral to secure the rentals for machines leased by the obligors from the obligees. It was held that on default the plaintiffs might take judgment and collect by execution, or rescind the contract and resume possession; but they could not adopt both remedies. The court said:

"The contract was to pass the possession of the machine to the defendant, and to make secure the payment of its value to the plaintiffs. Its value, as fixed by both parties, was $1,700. It is fair to presume the plaintiffs intended by the contract to get this sum once, and that the defendant did not intend to pay it, or any part of it, twice. Parties may, in contracting, provide penalties for nonperformance; but, unless they do so in unmistakable language, courts will not insert them."

After reviewing the provisions of the contract, the court further said:

"The plaintiffs had two distinct remedies, either of which they might adopt to enforce their right. They parted with the possession of the machine at the price of $1,700; $750 of this to be paid in hand, which they received. They still retained title, with the right to resume possession on default in either payment of $316.67; but, the subject of the contract being a movable chattel, and its security being, at best, little more than a chattel mortgage, they took a personal judgment bond, with power of attorney to enter it and confess judgment in any court of record. * * * Either remedy was complete in itself, and the plaintiffs, on default, could adopt either; but they were not cumulative—they could not adopt both—unless it was plainly expressed in the contract, or a necessary implication from its terms. * * * On default of payment, the plaintiffs were not bound to accept the machine or take possession of it. They could have entered judgment on the bond, levied on the machine and any other property of defendant, in satisfaction of their demand. But they rescinded the contract by retaking into their possession the subject of it, which they had a right to do, and then immediately entered their bond and issued execution to levy on other property of defendant, which they had no right to do, for the contract or obligation to which the bond was collateral no longer existed."

In Minneapolis Harvester Works v. Hally, 27 Minn. 495, 8 N. W. 597, the harvester works made a sale of machinery, taking therefor a promissory note for $240, bearing 12 per cent. interest per annum; the written contract containing a condition that the ownership and right of possession should not pass from the harvester company until the note and interest were paid in full. "And the said Minneapolis Harvester Works, or their authorized agents, are hereby fully authorized and empowered to proceed to collect the same at any time they may reasonably deem themselves insecure, and, even before the maturity thereof, may take possession of said machine, sell the same, and apply the proceeds towards the payment of this note, after paying all costs and necessary expenses; also this note to become due upon the removal of its maker from the county wherein he now resides." The vendor afterwards took possession of the machine from the defendant. The court said:

"It appears from the undisputed evidence on both sides that the machines have been taken from the possession of the defendant by the plaintiff and sold. The result is that there is a total failure of the consideration expressed in the instrument. The case is one of a conditional sale; that is to say, of a

transaction which was to take effect as a sale, so as to pass the title of the reapers and the right of possession upon payment therefor, and not otherwise. The defendant not only never acquired any title, ownership, or right of possession of the machines but he has by the act of the plaintiff been deprived of the power of acquiring any by paying the price specified in the instrument."

See, also, Moultrie Repair Company v. Hill, 120 Ga. 730, 48 S. E. 143; Turk v. Carnahan, 25 Ind. App. 125, 57 N. E. 729, 81 Am. St. Rep. 85; Holt Mfg. Co. v. Ewing, 109 Cal. 353, 42 Pac. 435.

The foregoing rule applies with equal rigor to contracts of lease. If the lessor enter for condition broken, and resume possession of the premises, he cannot hold the premises and collect accruing rent, for the reason that the use of the property is the sole consideration for the obligation to pay. He cannot have both, for he is not entitled to be twice paid. Watson v. Merrill, 136 Fed. 359, 69 C. C. A. 185, 69 L. R. A. 719.

It is not contended that parties who are sui juris, competent to contract, may not confer upon the vendor or lessor the double remedy for failure to pay; but the assertion of such cumulative right is so harsh, oppressive, and unjust that courts will never recognize and enforce it, unless it is so clearly nominated in the bond as to leave no reasonable doubt that such was the intention of the parties.

Turning to the provisions of the written agreement under review, it is to be observed that the first requirement was that the work on the slag dump was to be performed in a thoroughly workmanlike manner. This was inserted evidently for the better protection of the vendor in the event of the failure of the vendee to pay the installment notes, so that if the vendor had to reclaim the property as little injury as possible would be done thereto by the manner of its use. This is followed by the provision:

"That any failure of the said party of the first part to do or to keep any of the agreements herein, including the above described agreement to work said slag dumps in blocks of one hundred (100) feet, or any failure to pay immediately when due any one or more of the said one hundred (100) promissory notes maturing on or before the said 8th day of May, 1905, or failure to pay the rest of said one hundred (100) promissory notes within six weeks after the same becomes due according to the tenor of the same, provided notice of extension, as aforesaid, shall have been given or the taking or using of more than five hundred (500) tons per week of and from the said slag dumps as hereinafter provided while any one or more of the said one hundred (100) notes shall remain unpaid shall work a forfeiture of all rights of the said party of the first part under this agreement."

The meaning and purpose of this was that on failure to do the given acts the purchaser's right to hold and remove the dump would be gone. This then is followed by the provision that:

"Said party of the second part shall have the right, on giving three days' written notice to the said party of the first part, to declare each and every one, and all of the said 100 promissory notes, or whatever number of said notes may remain unpaid, given to pay for the within lease, immediately due and payable, and shall have the right, immediately, to collect the same."

Here is a single provision respecting the right to mature all the notes in case of default in the payment of one, with a right to immediately collect the same. It is a complete remedy within and of itself.

There are two noticeable facts in the foregoing provisions: (1) It is expressly stated that the notes to be matured were "given to pay for the within lease" (that is, for the right to remove and appropriate the slag) and, therefore, if immediately collected, the slag, which constituted the consideration for the notes, would belong to the payor; and (2) it is expressly declared that the work done and money already paid should be forfeited as liquidated damages. On the maxim "Expressum facit cessare tacitum," the idea of treating the whole purchase price as liquidated damages is excluded. This becomes obvious by the provision authorizing a re-entry being immediately preceded by the conjunction "and," coupling it with the forfeiture as aforesaid, of all work done and money paid as liquidated damages.

It is an ordinary provision in contracts of conditional sales, where the vendee shall have made some preliminary payment, and should fail to meet the balance as required, to declare that what has been paid shall be forfeited to the vendor as liquidated damages, and is not inconsistent with the additional right of reclamation.

Indeed, this provision in the contract respecting the forfeiture of work done and money paid is but expressive of the general rule of law that the purchaser in default will not be permitted to "both withhold the purchase money and keep possession and enjoy the rents and profits of the estate; nor will it subject the vendor to the return of the purchase money if he is obliged to go into a court of equity to be restored to the possession." Hansbrough v. Peck, 5 Wall. 497, 505, 18 L. Ed. 520. In this case the court holds that, in default of the payments of the installments of purchase money, the vendor has two remedies: (1) he may sue upon the contract and recover judgment for the purchase money, and may levy execution upon any property of the defendant, including the property sold; or he may bring an action for the recovery of possession; or he may go into a court of equity in the first instance and call on the purchaser to pay the money due, and thereafter be foreclosed from setting up any claim to the property. "And no rule in respect to the contract is better settled than this: That the party who has advanced money, or done an act in part performance of the agreement, and then stops short and refuses to proceed to its ultimate conclusion, the other party being ready and willing to proceed and fulfill all his stipulations according to the contract, will not be permitted to recover back what has thus been advanced or done."

In the case at bar the installments to be paid would not greatly exceed the quantity of slag removed, and, as the value of the work done preparatory to its removal might be difficult of ascertainment, it was reasonably declared that these should be forfeited as liquidated damages in case of re-entry and retaking. As these were the only matters to be forfeited as liquidated damages, the idea is precluded that the residue of the purchase money could be also claimed to be forfeited as liquidated damages in case of re-entry. Such a construction of the contract would be so incongruous and oppressive that courts, consistent with the expression, would, if possible, so construe the whole contract as to harmonize all its parts and avoid inconsistencies, harsh and oppressive results.

Among the rules of construction to prevent incongruities and absurdities is that the word "and" may be read "or," and vice versa, as "these words are said to be convertible with each other as the sense of the enactment (or contract) and the necessity of harmonizing its provisions may require." Endlich on Interpretation of Statutes, § 303. This rule is predicated of the assumption that it could not have been intended to produce absurd and unreasonable results; "and consequently, when such effects would follow a literal construction of the statute, the conjunctive particle may be read as disjunctive, or vice versa, on the theory that the word to be corrected was inserted by inadvertence or clerical error." See, also, Thomas v. Grand Junction, 13 Colo. App. 80, 84, 85, 56 Pac. 665; Kitchen v. Southern Railway Company, 68 S. C. 554, 48 S. E. 4.

From the contract as a whole, it is manifest to our minds that it could not have been the purpose of both parties to the contract that the right to collect the entire purchase money was given in addition to the right to re-enter and retake the property which constituted the consideration for the notes. This unreasonable, absurd, and confiscatory result is avoided, under the foregoing rule, by substituting the word "or" for "and," which occurs immediately after the words "shall work a forfeiture of all rights of the said party of the first part under this agreement," so as to make the provision of the contract in question read as follows:

"It is mutually agreed that all work on the said above described slag, slag dumps and materials and smelter products shall be performed in a thoroughly workmanlike manner, and that any failure of the said party of the first part to do or to keep any of the agreements herein, including the above described agreement to work said slag dumps in blocks of one hundred (100) feet, or any failure to pay immediately when due any one or more of the said one hundred (100) promissory notes maturing on or before the 8th day of May, 1905, or failure to pay the rest of said one hundred (100) promissory notes within six weeks after the same becomes due according to the tenor of the same, provided notice of extension, as aforesaid, shall have been given, or the taking or using of more than five hundred (500) tons per week of and from the said slag dumps as hereinafter provided while any one or more of the said one hundred (100) notes shall remain unpaid, shall work a forfeiture of all rights of the said party of the first part under this agreement, or (the other alternative provision) the said party of the second part shall have the right, on giving a three days' written notice to the said party of the first part, to declare each and every one, and all of the said one hundred (100) promissory notes, or whatever number of the said notes may remain unpaid, given to pay for the within lease, immediately due and payable, and shall have the right, immediately, to collect the same from the said party of the first part, and in case of forfeiture as aforesaid (that is, if the alternative forfeiture requiring an immediate collection of the remaining notes is chosen), all work done and money expended by the said party of the first part shall inure to the benefit of the said party of the second part as liquidated damages for the failure of the said party of the first part to keep the agreements in this writing; and the said party of the second part, or his agent, may thereupon, with or without demand of possession in writing, enter upon said premises and dispossess all persons occupying the same, with or without force, and with or without process of law, or, at the option of said party of the second part, the said party of the first part, its officers or agents, and all persons found in occupation, may be proceeded against as guilty of unlawful detainer."

Had it been intended that the vendor should be entitled to a forfeiture and also to collect the remaining notes, the natural and easy

way to have expressed such purpose would have been, just as in the case of work done and money expended, by saying the notes should be immediately collected as liquidated damages; or by some other apt expression, as by saying that such re-entry shall not work a forfeiture of the right to collect the unpaid purchase money as aforesaid, or the like.

The case of Grommes v. St. Paul Trust Company, 147 Ill. 634, 35 N. E. 820, 37 Am. St. Rep. 248, cited by appellants' counsel, aptly illustrates the distinction under discussion. That was an ordinary lease of a building for a given term at a fixed monthly rental, containing the following express provision:

"It is further agreed by and between the parties hereto that should said party of the second part fail to make the above mentioned payments as herein specified, or to pay any of the rent aforesaid, when due, or shall fail to fulfill any of the covenants herein contained, then and in that case, it shall be lawful for the said party of the first part to re-enter and take full and absolute possession of the above rented premises, and to hold and enjoy the same fully and absolutely, without such re-entry working a forfeiture of the rents to be paid and the covenants to be performed by the said party of the second part, or any of the same, during the full term of this lease."

The court, after discussing the rule that such re-entry would extinguish the future rental, observed that "such cases are distinguishable from the case at bar in that here the lease, which is signed by the tenant, and under the terms of which he entered into possession of the demised premises, provides that the re-entry by the landlord shall not work a forfeiture of the rents to be paid after such re-entry." As in that case the lessor had relet the premises after the resumption of possession, the court said:

"The provision does not contemplate the collection of double rent, but the rent due from the original lessee is to be credited with such rent as is realized from the reletting. The lessor is entitled to such sum as shall be equal to rents required by the terms of the lease to be paid during the full term, and not to any greater sum."

There is no provision in the agreement at bar that in the event of default Jarmuth might take possession of the slag as the agent for the benefit of the company, or that he might relet the same. On the contrary, the evidence is that he disposed of the same absolutely.

The case of Lamson Consol. Store Service Company v. Bowland, 114 Fed. 639, 52 C. C. A. 335, is quite pertinent. The lease was of a store service apparatus, reserving a stipulated annual rental, payable quarterly in advance. It provided that, if any installment remained unpaid for 90 days, the rental for the entire term should become at once due. It declared that the lessee should make no alterations in the mechanism, or remove the apparatus, or use it elsewhere than in the store. The agreement concluded as follows:

"That in case of a breach of any of the covenants or agreements to be observed on the part of the lessee, or attached by process of law, by proceedings in bankruptcy, or insolvency, or otherwise, the lessor may enter and take possession of the system. * * * No removal of said system made by the lessor during the term on account of any determination of the lessee's tenancy, or on account of any default by the lessee, shall constitute a surrender of the lease."

The day before a certain installment of rent became due, a petition in involuntary bankruptcy was filed against the lessees, and they were adjudged bankrupt. The installment falling due the day next after the filing of the petition in bankruptcy was not paid in full, and the lessors retook possession. It was held that the resumption of possession for any reason other than termination of the lessees' tenancy prevented the lessor from collecting future rents. The court said:

"The lessors invoke the third clause of the lease contract, which provides that: 'If any installment of said rental shall remain unpaid for sixty days after it becomes due, the entire rental to the end of the lease shall become at once due and payable.' It is entirely competent to contract that the consequence of a default in the payment of an installment of interest for the use of money, or of rent for the use of property, shall be the precipitancy of the maturity of the principal of the money loaned, or of future installments for the rental of the property in respect to which default has been made. Rent is the compensation for the use and enjoyment of the thing rented, and is ordinarily demandable whether the tenant actually enjoy the use and possession of the subject of the rent or not, unless the failure is due to some fault of the letter. But in this case the letter demands that the lessee shall continue to pay rent; although it has repossessed itself of the thing for the enjoyment of which the rent is to be paid. The resumption of possession by the lessor operates as a surrender of the lease, and puts an end to the liability of the lessee for future rents, unless otherwise provided. A covenant in a lease authorizing a landlord, on default of rent, to take possession, and relet, if possible, for the benefit of the tenant, and that in such case the tenant shall remain liable for the deficiency, or for the whole rent if a reletting is impossible, has been held valid. In case of a covenant such as that just mentioned, the lessor's possession would be as agent for the lessee; and the liability of the lessee would be contingent upon a deficiency, and clearly not such a fixed and absolute liability as would be provable in bankruptcy. In the lease here under consideration, the lessor has reserved the right to resume possession in quite a number of contingencies, the effect of which the contract declares shall be to 'determine all right and interest the said lessee may have in said system.' Without more, it cannot be that the lessee shall be liable for the future rents, when the effect of the act of the lessor has been to determine all his right and interest in the subject of the lease. Forfeitures are never favored, and when it is claimed that the lessor of property may resume possession of the subject-matter of the lease, and continue to hold the lessee liable for future rents, although deprived of the use and enjoyment of the thing leased, the terms of the bond must be exceedingly plain. Liability under such circumstances for future rents would be in the nature of a penalty, and the covenant by which the lessor may have both the use of the thing rented, and the compensation which the lessee was to pay for its use, must be so specific as that no other reasonable interpretation can be placed upon it."

It is a noticeable fact that, in the petition for the allowance of the claims in question against the bankrupt estate, there was a singular omission in stating what was the consideration of the notes sought to be allowed against the estate, as required by the bankrupt law; the petitioner contenting himself with stating that the consideration was for the transfer of the notes to him by Jarmuth. The palpable reason for this omission in the statement of his case was that he would have had to disclose that the consideration for the notes as between the original parties was the right to remove and use the slag dumps. The evidence in this case shows that the notes paid by the vendee, up to the time of the forfeiture, fully covered all the slag removed, and the petitioners' evidence tended to show that the slag in the dump was actually worth more than the contract price; and, yet, while the vendor

took back and appropriated the entire remaining property, thereby taking away from the vendee and its creditors the very means of paying the notes given therefor, the petitioners come into a court of bankruptcy to have allowed against the estate the entire unpaid contract price, amounting to about $45,000.

In our judgment the right to such extraordinary exaction is not clearly so nominated in the bond, and the decree of the District Court in disallowing the claims should therefore be affirmed.

It is accordingly so ordered.

SANBORN, Circuit Judge (concurring). In my opinion the contract here in question evidences a conditional sale wherein the parties intended to agree, and did agree, that upon default in payment of any of the installments the vendor might collect the entire purchase price and might also retake and hold the property sold. It is only by a change in the decisive word of the agreement which seems to me to make the contract mean the very opposite of what the parties intended and clearly expressed and by an extended argument that a different construction is justified. I am content to take the agreement as the parties made and executed it without change. But such a contract is so unconscionable that it may not be enforced in equity, and a proceeding in bankruptcy is a proceeding in equity. In such a contract the vendor has the option to retake the property sold, to keep the payments already made, and to abandon collection of the future installments, or to keep the payments already made, to enforce the collection of the future installments by the sale of the property which he has taken back on the theory that it is security for the payment of the installments, to apply the proceeds to their payment and collect the balance, or to leave the property sold in the possession and ownership of the vendee and to collect the entire future installments. He may not, however, retake and retain the property sold, and then recover in equity the future installments of its purchase price, because the sale of the property is the consideration of the notes given or the promise made to pay the price.

On this ground I concur in the affirmance of the decree below.